### JERSEY CENTRAL POWER & LIGHT CO. v. FEDERAL POWER COMMISSION. NEW JERSEY POWER & LIGHT CO. v. SAME.

#### Nos. 7256, 7257.

Circuit Court of Appeals, Third Circuit.

Argued Dec. 17, 1941.

Decided May 25, 1942.

As Amended July 11, 1942.

Frederic P. Glick, of New York City (Allen E. Throop, of New York City and Saul, Ewing, Remick & Harrison and Walter Biddle Saul, all of Philadelphia, Pa., on the brief), for New Jersey Power & Light Co.

Joseph F. Autenrieth, of Newark, N. J. (Autenrieth & Wortendyke, of Newark, N. J., on the brief), for Jersey Central Power & Light Co.

Lambert McAllister, of Washington, D. C. (W. A. Whittlesey, of Washington, D. C., on the brief), for respondent.

Before BIGGS, MARIS, and GOODRICH, Circuit Judges.

BIGGS, Circuit Judge.

### Questions Involved.

The petitioners in the cases at bar, Jersey Central Power and Light Company and New Jersey Power and Light Company, seek review of an order of the Federal Power Commission entered July 18, 1939, pursuant to the Federal Power Act, 16 U.S. C.A. § 791a et seq. The first question presented for our determination is whether this court has jurisdiction of the petitions by virtue of Section 313(b) of the Federal Power Act, 16 U.S.C.A. § 825*l*(b). The second question is whether the "Determination of the Commission" can be sustained on its merits. The facts are as follows:

### Facts.

On June 7, 1938 the Commission entered an order pursuant to the provisions of Section 301(b), Part III of the Federal Power Act, 16 U.S.C.A. § 825(b), directing the petitioner, Jersey Power, to submit information concerning the acquisition by it of 341,350 shares of the common stock of the petitioner, Jersey Central, without the authorization of the Commission and allegedly in violation of Section 203(a) of the Act, 16 U.S.C.A. § 824b(a). This section provides that no public utility within the purview of the Act shall purchase or acquire any security of any other public utility within the purview of the Act without having first secured an order of the Commission authorizing it to do so. Jersey Power, admitting that it was a public utility within the meaning of Section 201(e) of the Act, 16 U.S.C.A. § 824(e), filed an answer to the Commission's order admitting that it had acquired the stock of Jersey Central but denying that the provisions of Section 203(a) were applicable to the transaction for the asserted reason that Jersey Central was not a public utility within the meaning of the Act. Jersey Central sought intervention, was made a party to the proceedings, and asserted the same defense. After hearing, the Commission found that Jersey Central was a public utility within the meaning of the Act and that Jersey Power had acquired the securities in violation of Section 203(a). The Commission issued its findings on July 18, 1939. Petitions for rehearing timely filed by both Jersey Central and Jersey Power were denied by the Commission on September 15, 1939. Review of the Commission's determination was then sought in this court.

Both Jersey Central and Jersey Power own and operate public utility systems in New Jersey. The petitioners and another electric public utility corporation, Public Service Electric and Gas Company, serve territories which comprise about two-thirds of the area of the State of New Jersey. Jersey Power's territory lies in the western part of the State and is bounded roughly upon the west by the line of the Delaware River and the western boundary of New Jersey. To the south Jersey Power's territory moves down with the line of the river to territory contiguous with that served

by the Philadelphia Electric Company and its subsidiaries in Pennsylvania.

Jersey Central for its part serves two non-contiguous areas in New Jersey. One lies to the north adjacent to and east of the territory of Jersey Power and contiguous to the area served by Public Service on the east. Jersey Central has another area of service to the south and east of the territory of Public Service just mentioned. The latter area of Jersey Central runs from the Atlantic coast back to and contiguous with territory served by Public Service. It is with this area of service of Jersey Central with which we are most concerned in the cases at bar. Beginning at a point near Barnegat on the Atlantic coast, Jersey Central's lines run north through the New Jersey seaside resorts to South Amboy. Further to the west in central New Jersey other lines of Jersey Central supply electricity to New Lisbon and villages and towns to the north of it. These western lines connect with the eastern system at South Amboy.

From South Amboy a main connecting line runs across the territory of Public Service into the northern area served by Jersey Central. There is a large generating plant at South Amboy which is connected with a substation maintained by Public Service at Perth Amboy on the opposite side of the Raritan River. This substation is known as the Mechanic Street Substation and what goes on there furnishes many of the basic facts giving rise to the controversy at bar.

The line which connects Jersey Central's generating plant at South Amboy with the Mechanic Street Substation is a little over two miles long. Jersey Central owns about seven-eighths of a mile of the connecting line, that portion of it which runs from Jersey Central's generating plant to the south bank of the Raritan River. At that point a submarine cable, owned by Public Service, takes the current under the Raritan River. Emerging from the river the current is taken by an overhead line owned by Public Service for a distance of about a mile and a fifth to the Mechanic Street Substation owned by Public Service. The connecting line comes into the Mechanic Street Substation through metering equipment and switches and is connected with a "bus-bar". There are a number of connections to the bus. Two are to the plant of the General Cable Corporation, a customer of Public Service. Two are connec-

tions with Metuchen, New Jersey. Another connection leads to the town of Keasby in that state. An additional connection runs to Public Service's substation at Carteret, New Jersey. There is also, and this is of particular importance, a tap with metering equipment and an air break switch connected to a line of Staten Island Edison Corporation which serves Staten Island, New York.

At this point it becomes necessary to endeavor to describe three "types" of electricity which flow through the Public Service bus-bar at the Mechanic Street Substation. These three "types" of power are designated as "emergency", "economy-flow" and "incidental" or "slop-over" power. The petitioners take the point of view that we are concerned particularly with the last two kinds of electrical energy. But the fact is that electricity is energy no matter what you call it and the "types" of electrical energy involved in the cases at bar, as the petitioners use that word, refer really to the kind of contractual relations between Jersey Central and Public Service on the one hand and Public Service and the Staten Island Company on the other, pursuant to which current comes to or from Public Service's bus-bar at the Mechanic Street Substation.

"Emergency" power is simply electricity supplied by one power company to another when the latter needs additional electrical energy to take care of an emergency. The cost of emergency power is higher than that of the other types of power. The cost of and conditions for supplying emergency power between Public Service and Jersey Central are governed by a contract executed by the two companies and dated March 24, 1931.

The contract of March 24, 1931, provides that if the interconnecting facilities of the two companies are made available for power other than emergency power, the use of the connections should be made available by agreement between the companies. Accordingly Jersey Central and Public Service arrived at an oral agreement for an interchange of "economy-flow" electricity. Economy-flow electricity may be described as energy generated and supplied by one company to another when the receiving company has enough generating facilities to generate that electricity for itself but elects to receive it from another company because that company can generate and deliver it to the point where it is

needed more cheaply than the purchasing corporation. Economy-flow power is supplied to Public Service by Jersey Central upon a day-to-day basis and the price is calculated by a formula which consists in taking half of the cost of the electricity to the generating company and adding to that figure half of what the cost would have been if the purchasing company had generated the electricity.

Public Service receives economy-flow current almost daily from Jersey Central but it should be noted that Jersey Central's net receipts from the sale of economy-flow current for the year 1937 were about $10,000 while its net income from all the electricity sold by it during the same period amounted to $4,170,585. Jersey Central in fact is principally engaged in the retail sale of electricity to numerous individual customers in its territory. We shall deal with the electricity supplied by Jersey Central to Public Service in terms of kilowatt-hours at a later point in this opinion.

We think that "slop-over" or "incidental" current is well described upon the brief of the petitioner, Jersey Power, as "* * * an electrical phenomenon which consists in an instantaneous, involuntary ebb and flow where there is a physical connection, otherwise unused, between two systems. Where such an unused connection exists the two systems are normally 'in balance'. When there is a sudden demand for more energy made on one of the systems, its generators are speeded up to meet the demand. There is a tendency, however, for the system on which the sudden demand is made, to draw on the system with which it is connected for the instantaneous period between the demand and the compensating generating speed-up * * *." Since the systems of Jersey Central, Jersey Power and Public Service are interconnected and are synchronized,[1] not only with each other but also with other electrical transmission systems covering the southern part of New Jersey, the southeastern part of Pennsylvania, the northeastern part of Maryland,

Delaware and with the Staten Island Company, "spinning" reserve is maintained by Jersey Central, Jersey Power and Public Service. Additional spinning reserve is procurable from interconnected public utilities in Pennsylvania and New York. Spinning reserve consists of spinning dynamos, whose current may be thrown on the circuits in case of necessity. Since these various electric utilities systems are interconnected, it is obvious that there will be some incidental or slop-over current passing through the various system connections including the bus-bar at the Mechanic Street Substation which comprise the connections between Jersey Central and Public Service on the one hand and Public Service and the Staten Island Company on the other.

According to an exhibit introduced in evidence by the Commission the amount of economy-flow current received by Public Service from Jersey Central in 1937 and in the first three months of 1938 far exceeded the current in that category gotten by Jersey Central from Public Service. This power was metered at South Amboy and passed through the bus-bar of the Mechanic Street Substation. In 1937, 55,421,000 KWH of electricity were delivered by Jersey Central to Public Service against 315,600 KWH received by Jersey Central from Public Service. For the first three months of 1938 Jersey Central delivered to Public Service 10,140,000 KWH against 87,400 KWH received by Jersey Central from Public Service. In 1936 Public Service received from Jersey Central 70,694,825 KWH against 1,400,720 KWH delivered by Public Service to Jersey Central. In 1935 the KWH delivered by the two companies to each other were comparable to the amounts delivered in 1936 and in 1934 the figures were comparable to those of 1937.

The meters at the Mechanic Street Substation were read at half hour intervals from 6 A.M. until midnight and at hour intervals from midnight to 6 A.M. These

[1] Synchronization consists in running the generators upon interconnected systems at the same rate of speed. One or more generators at strategic points upon the connected systems set the pace like metronomes running in unison. It appears from the record in the cases at bar that the metronome generators which set the pace for the interconnected alternating current power systems which we are discussing are operated on the systems of other interconnected public utility systems in Pennsylvania and New York. The Staten Island Company is in turn a part of and connected with one of these systems. Though much emphasis is laid by some of the Commission's witnesses on the phenomenon of synchronization, it does not possess significance under the facts of the appeals at bar except to the extent indicated in the opinion.

readings were recorded regularly on log sheets kept by the station employees. From January 1, 1937 to September 6, 1938, 25,500 readings were made and recorded in the log. 184 readings, which the Commission found representative, were selected from the 25,500 readings and analyzed further by the Commission's experts. These show that as electricity flowed from Jersey Central to the Mechanic Street Substation, current flowed out from the bus-bar to the Staten Island Company. The 184 readings demonstrated that the electricity transmitted by Jersey Central to Public Service exceeded the local requirements for electricity from the bus-bar. 24 of the 184 readings were subjected to further analyses by the Commission in an attempt to determine the percentage of electricity supplied to the Staten Island Company originating in the Jersey Central system. The Commission found that these readings demonstrated that electricity was flowing out of all of the bus-bar connections except the connection with Jersey Central where current was flowing in. As a consequence the Commission found there was no electricity coming in to the bus-bar on these occasions except from Jersey Central. As to five periods examined it appeared that the flow of electricity to Public Service on the bus-bar from Jersey Central exceeded the requirements of the Central Division of Public Service, the load required to maintain the Staten Island Company and all local requirements of the substation.

The petitioners take exception to the conclusions drawn from the readings by the Commission's experts. They say that you can't earmark a kilowatt. This saying is as true as a statement that running water cannot be earmarked. But if water is put into a reservoir which is connected with pipes which cross state lines, some of the water will cross state lines and enter into interstate commerce if it be the subject of commercial transactions. The analogy between water and electricity is illustrative of the facts in the case at bar. The Commission was justified in finding as a fact that some of the electricity generated by Jersey Central at its South Amboy plant reached Staten Island.

Operators of the Staten Island Company stationed at the Staten Island end of the submarine cable running from the bus-bar under the Arthur Kill and operators of Public Service on the New Jersey side of that estuary watched meters which registered the flow of current passing between the two companies and could and did cut the flow of electricity between them from time to time. The petitioners contend that much of the electricity which passed through the connection was slop-over or incidental current, that such flow was accidental and unintentional and should be disregarded as not in fact constituting interstate commerce. But on at least six occasions between August, 1935 and March, 1938 emergency current was metered through the cable from Public Service to Staten Island. Economy-flow current passed with some frequency between Public Service and the Staten Island Company. Between August 26, 1935, and December 31, 1935, the Staten Island Company got economy-flow current from Public Service at least ten times and received approximately 51,800 KWH from such flow. In 1936 the Staten Island Company received economy-flow current from Public Service thirty-seven times and got over 329,600 KWH therefrom. As an exhibit introduced by Jersey Power before the Commission shows, from the end of August, 1935, until the middle of March, 1938, leaving incidental flow out of the calculation but including emergency current therein, the Staten Island Company received 403,125 KWH from Public Service for which it paid over $3,300.

The amount of incidental flow current between Public Service and the Staten Island Company from the end of August, 1935, to the middle of March, 1938, is shown by another exhibit introduced into evidence by Jersey Power. It appears that from August 26 to December 31, 1935, the Staten Island Company delivered to Public Service 1,125,000 KWH of electrical energy and received from Public Service in the same period 1,013,900 KWH leaving an excess of deliveries from Staten Island to Public Service of 111,100 KWH. Transmission figures of KWH for 1936, 1937 and 1938 are comparable and show that throughout the period designated, the Staten Island Company delivered more incidental flow current to Public Service than it received from that company. But the emergency and economy-flow current which the Staten Island Company received from Public Service was much greater than the amount of incidental flow current which went from the Staten Island Company to Public Service. Subtracting the value of

the incidental flow current delivered by Staten Island to Public Service from the emergency and economy-flow current delivered by Public Service to Staten Island we arrive at the balance of 52,100 KWH in favor of the Staten Island Company for which that company paid Public Service over $2,400.

How much of the electricity which flowed from Public Service to the Staten Island Company originated in Jersey Central's South Amboy generators and passed over the connecting line from South Amboy to the Mechanic Street Substation and thence through the bus-bar to the Staten Island Company no one can say. It is certain that some did go to the Staten Island Company. Measured in terms of the KWH generated and transmitted by large electric public utility systems it was small.

There are details of the picture which we have omitted but what we have said presents with reasonable accuracy the situation between Jersey Central and Public Service on the one hand and Public Service and the Staten Island Company on the other.

The Commission bases its entire case upon the transmission of electricity by Jersey Central over the connecting line to Public Service and the fact that some part of this current reached the Staten Island Company.

## The Law

### Jurisdiction to Review the Determination by the Commission.

A preliminary question must be disposed of. The petitioners assert that this court has jurisdiction to review the "Determination by the Commission" which found Jersey Central and Jersey Power to be public utilities within the meaning of Part II of the Federal Power Act, 16 U.S.C.A. § 824 et seq. The Determination by the Commission was followed by its order denying petitions for rehearing. The denial of such petitions is a prerequisite to the review prescribed by the Act in courts of appeals. See Section 313 of the Act, 16 U.S.C.A. § 825*l*, which provides that any party to a proceeding under the Act aggrieved by "an order" issued by the Commission may obtain a review of such order in a Circuit Court of Appeals upon the denial of rehearing by the Commission. The question which we must determine is whether the "Determination by the Commission" has the status of a reviewable order within the purview of Section 313(b) of the Act, 16 U.S.C.A. § 825*l*(b).

There can be no doubt that the effect of the Commission's determination is to establish Jersey Central's status as a public utility within the meaning of Section 201 of the Federal Power Act, 16 U.S.C.A. § 824. If the determination by the Commission that Jersey Central is a public utility stands, the sale of the stock of Jersey Central to Jersey Power became subject to the provisions of Section 203(a) of the Act. But more than this, if the determination is affirmed, all the provisions of Parts II and III of the Act, 16 U.S.C.A. § 824 et seq., § 825 et seq., become applicable to Jersey Central. Some of the prohibitions and commands imposed by the statute upon a corporation with the status of a public utility within Section 201 of the Act are set out in the margin. These may be felt to be burdensome and onerous but Congress has determined them to be necessary for the regulation of electric public utilities engaged in interstate commerce.[2]

While the rules which we must follow

---

[2] A public utility may not sell, lease or otherwise dispose of its facilities without the approval of the Commission, Section 203(a), 16 U.S.C.A. § 824b(a):

May not establish rates and charges without the approval of the Commission, Section 206(a), 16 U.S.C.A. § 824e(a):

May be required to render more efficient service by the Commission, Section 207, 16 U.S.C.A. § 824f:

Must file upon the request of the Commission inventories, statement of original cost, and inform the Commission as to all additions, extensions and new construction, Section 208(b), 16 U.S.C.A. § 824g(b):

Must keep its accounts according to regulations prescribed by the Commission, Section 301(a), 16 U.S.C.A. § 825(a):

Must furnish to the Commission any information in respect to its accounts and records, maps, contracts and reports which the Commission may require, Section 301 (b), 16 U.S.C.A. § 825(b):

Its rates of depreciation may be fixed by the Commission, Section 302, 16 U.S.C.A. § 825a:

Must file annual and periodic special reports as required by the rules or orders of the Commission, Section 304, 16 U.S.C.A. § 825c:

Must not have as directors any officer or director of a bank, trust company, banking association, or firm authorized

in determining whether the Commission's determination may be reviewed by this court are not set out specifically in the decision of the Supreme Court in Rochester Telephone Corporation v. United States, 307 U.S. 125, 59 S.Ct. 754, 83 L.Ed. 1147, none the less the case indicates what our conclusion should be. In the Rochester case the Supreme Court was dealing with an appeal under Section 238 of the Judicial Code as amended, 28 U.S.C.A. § 345, from a final decree by a district court of three judges under the Urgent Deficiencies Act of October 22, 1913, 28 U.S.C.A. §§ 45, 47a, as extended by Section 402(a) of the Federal Communications Act, 47 U.S.C.A. § 402(a), dismissing on the merits a bill to review an order of the Federal Communications Commission.

The Federal Communications Commission had ruled that the Rochester Telephone Corporation owed obedience to certain orders issued by the Commission. Those orders required all telephone carriers subject to the Federal Communications Act to file schedules of their charges, copies of their contracts with other telephone carriers and other information. The Rochester Telephone Company not responding to the orders, a Division of the Commission ordered the company to show cause why it should not be required to file responses to the orders served upon it. The Rochester Telephone Company answered and took the position that it was outside the requirements of the Federal Communications Act in the matters concerning which the Commission attempted to impose its jurisdiction. The Commission determined that the Rochester Telephone Corporation was under the "control" of the New York Telephone Company and therefore was not entitled to the classification of a mere connecting carrier under Section 2(b)(2) of the Act, 47 U.S.C.A. § 152(b)(2). The Rochester Telephone Company filed a bill in the District Court seeking to have the orders of the Commission set aside and annulled. The District Court, 23 F.Supp. 634, held that that company did not come within the exception set forth in Section 2(b)(2) of the Act and it appealed.

The Supreme Court by Mr. Justice Frankfurter discussed the procedural problems involved in appeals from "negative" orders or orders vel non, dividing, 307 U.S. pages 129, 132, 59 S.Ct. 754, 756, 83 L.Ed. 1147, the prior decisions involving "negative" orders into three categories. We are interested in the second of these categories because the orders therein bear an analogy to the "Determination by the Commission" at bar. That second category is: Where the action of the Commission sought to be reviewed declines to relieve the complainant from the command of a statute forbidding or compelling conduct on his part. As an example Mr. Justice Frankfurter cites, " * * * A denial of permission by the Interstate Commerce Commission for a departure from the long-short haul clause." The second group " * * * is composed of instances of statutory regulations which place restrictions upon the free conduct of the complainant."

The complainant may rid himself of these restrictions by asking the Commission to place him outside of the statute or, if within the terms of the statute, he may invoke the dispensing power of the regulatory body. In the latter situation the complainant, seeking a judicial review to rid himself of adverse action by the Commission, must clear the three hurdles of the existence of a case or controversy under Article III of the Constitution, "the conventional requisites of equity jurisdiction; [and] the specific terms of the statute granting to the district courts jurisdiction in suits challenging 'any order' of the Commission." If he can clear these hurdles he reaches his goal, the jurisdiction in the reviewing court, to hear his appeal. In the case at bar the three hurdles have been

---

to underwrite securities of a public utility or an officer or director of an electrical equipment company supplying electrical equipment to such public utility, Section 305(b), 16 U.S.C.A. § 825d(b):

Must pay penalties fixed by the Commission not to exceed $1,000 for wilful failure to comply with any order or to respond to any subpoena, issued under the Act, Section 315, 16 U.S.C.A. § 825n:

For any wilful or knowing act of commission or omission in violation of any of the terms of the Act any person may be punished by a fine not exceeding $5000 or imprisonment for not more than two years or both, Section 316(a), 16 U.S.C.A. § 825o(a):

And for any wilful or knowing violation of any rule, regulation, condition or order made by the Commission any person may be punished by a fine not exceeding $500 per day for each and every day during which the offense occurs, Section 316(a) and (b), 16 U.S.C.A. §§ 825o(a) and (b).

removed by the specific review provisions of Section 313(b) of the Federal Power Act. The "Determination by the Commission" at bar is analogous to the orders in the second group described by Mr. Justice Frankfurter, orders imposing statutory obligations and prohibitions and it should follow that this court has jurisdiction to review the action of the Federal Power Commission which makes Jersey Central subject not only to statutory regulations which interfere with its freedom of conduct but compel specific actions by the Company and prohibit other actions by it.

In the case of Federal Power Commission v. Pacific Power & Light Co., 307 U.S. 156, 59 S.Ct. 766, 767, 83 L.Ed. 1180, the question was presented as to whether an order of the Commission denying an application under Section 203(a) of the Act, the very section which the Commission invoked in the case at bar, was reviewable under Section 313(b). The facts were as follows. Two operating power companies filed a joint application under Sections 8 and 203 of the Act, 16 U.S.C.A. §§ 801 and 824b(a), proposing to transfer all of the assets including licenses from one company to the other, terminating the existence of the first company. The Federal Power Commission found that the applicants had failed to establish that the proposed transfer would " * * * be consistent with the public interest within the contemplation of Section 203(a) of the Federal Power Act * * *." and denied the application. The power companies sought a review of the Board's order before the Circuit Court of Appeals for the Ninth Circuit and the Commission challenged the jurisdiction of that court by a motion to dismiss the petition on the ground that the court was without jurisdiction under Section 313(b) because the order of which review was sought was a negative order.

The Supreme Court, ruling that the order complained of was reviewable, 307 U. S. page 159, 59 S.Ct. 767, 83 L.Ed. 1180, stated that if the Federal Power Act had included the provisions of the Urgent Deficiencies Act pertaining to reviews of orders of the Interstate Commerce Commission, the decision of the Supreme Court in the Rochester Telephone Corporation case would sustain the assumption of jurisdiction by the circuit court of appeals. Mr. Justice Frankfurter said, "But the Power Act contains a distinctive formulation of the conditions under which resort to the courts may be made and Congress determines the scope of jurisdiction of the lower federal courts." Referring to Section 313 (b), the Supreme Court concluded that the denial of the power companies' application by the Commission as not consistent with the public interest, was an order; that the petitioners were aggrieved by it since without such approval the transfer was forbidden. "Thus," said the Supreme Court, "the statutory scheme of the Power Act only reinforces the analysis made in the Rochester case."

The determination by the Commission that the acquisition of stock of Jersey Central by Jersey Power was in violation of Section 203(a) of the Act is paralleled by the order of the Commission denying the application of the power companies in the Pacific Power & Light Co. case. In the instant case the Commission viewed what had been done in retrospect and in effect forbade it. In the Pacific Power & Light Co. case the Commission viewed what was contemplated and ordered the power companies not to carry out the transfer of assets. In the instant case the Commission found Jersey Central to be a public utility within the meaning of Section 201 and thereby imposed upon Jersey Central the burden of complying with the provisions of the Act.

We conclude therefore that we have jurisdiction to review the Determination by the Commission. Compare Canadian River Gas Co. v. Federal Power Commission, 10 Cir., 110 F.2d 350; Id., 113 F.2d 1010, certiorari denied 311 U.S. 693, 61 S.Ct. 76, 85 L.Ed. 449.

### Is Jersey Central a Public Utility Within the Meaning of Section 201 of the Act?

Section 201(e) of the Federal Power Act, 16 U.S.C.A. § 824(e), defines the term "public utility" when used in Parts II and III, 16 U.S.C.A. §§ 824 et seq., 825 et seq., as " * * * any person who owns or operates facilities subject to the jurisdiction of the Commission under this Part. [sections 824–824h of this title]." To determine whether Jersey Central is a public utility within Section 201(e), it is necessary to determine the meaning of the word "facilities" as used in that subsection; that is to say, it is necessary to determine the existence or non-existence of "facilities" subject to the jurisdiction of the Commis-

sion. Section 201(b), 16 U.S.C.A. § 824 (b), provides that the provisions of Part II shall apply to the transmission or sale at wholesale of electricity in interstate commerce " * * * but shall not apply to any other sale of electric energy * * * ". The subsection then goes on to provide that the Commission shall have jurisdiction " * * * over all facilities for such transmission or sale of electric energy, but shall not have jurisdiction, except as specifically provided in this Part and the Part next following [sections 824–825r of this title], over facilities used for the generation of electric energy or over facilities used in local distribution or only for the transmission of electric energy in intrastate commerce, * * * ". Section 201(c), 16 U.S.C.A. § 824(c), provides that for the purpose of Part II, " * * * electric energy shall be held to be transmitted in interstate commerce if transmitted from a State and consumed at any point outside thereof; * * * ".

The Commission takes the position that Jersey Central owns and operates "facilities" subject to its jurisdiction because Jersey Central transmits electricity from its South Amboy generating plant through the line owned by it, seven-eighths of a mile long, which connects at the south bank of the Raritan River with the line of Public Service which runs into the Mechanic Street Substation and is attached to the bus-bar which distributes current to the Staten Island Company. Therefore, says the Commission, Jersey Central is a public utility within the meaning of Section 201 (e).

The petitioners lay emphasis on the provisions of Section 201(a), 16 U.S.C.A. 824 (a), which contains the declaration of policy embraced by Congress in passing the Federal Power Act. That Section provides: "It is hereby declared that the business of transmitting and selling electric energy for ultimate distribution to the public is affected with a public interest, and that Federal regulation of matters relating to generation to the extent provided in this Part and the Part next following [sections 824–825r of this title] and of that part of such business which consists of the transmission of electric energy in interstate commerce and the sale of such energy at wholesale in interstate commerce is necessary in the public interest, such Federal regulation, however, to extend only to those matters which are not subject to regulation by the States." Jersey Central takes the position that all phases of the conduct of its business properly are subject to regulation by the State of New Jersey and that the New Jersey statute regulating Public Utilities (R.S.1937, 48:2–13, N.J.S.A. 48:2–13) is entirely sufficient to control and regulate Jersey Central. That company lays particular emphasis on Section 204(f), 16 U.S.C.A. § 824c(f), which provides that "The provisions of this section shall not extend to a public utility organized and operating in a State under the laws of which its security issues are regulated by a State commission."

Jersey Central points out that the Commission finds that because the electricity which moves between the Staten Island Company and Public Service is in interstate commerce, the facilities of Jersey Central which conduct that electricity to Public Service are in interstate commerce, though wholly within the State of New Jersey and functioning solely by reason of a contract between Jersey Central and Public Service for the delivery of electricity from the former company to the latter within the State of New Jersey. This conclusion, says Jersey Central, " * * * is based solely on insignificant and relatively infrequent but wholly uncontrolled occasions when energy of Jersey Central is found in the Staten Island facilities." Both petitioners contend that the Federal Power Act was not intended to include within the jurisdiction of the Commission such a facility as Jersey Central's short line and state that it is an absurdity to bring within federal jurisdiction a generating company whose electricity happens to flow across a state border into the system of a neighboring company. It is, of course, beyond dispute that Jersey Central itself sells no electricity directly in interstate commerce. So far as this record shows, aside from its own local customers, Jersey Central sells electricity only to Public Service and delivers that electricity to Public Service wholly within the State of New Jersey. The jurisdiction of the Commission must rest upon Jersey Central's ownership and operation of facilities for transmission of electricity which flows under the Arthur Kill from New Jersey to Staten Island.

The petitioner, Jersey Power, lays emphasis also upon the legislative history of Parts II and III of the Act. It points out that the first bill introduced on the subject, S. 1725, 74th Cong., 1st Sess., February 6,

1935, provided by Section 201(a) that the provisions of the title should apply to the transmission and sale of electric energy in interstate commerce, to the production of energy for such transmission and sale, and that the Commission should have jurisdiction over "all facilities for such transmission, sale and/or production of energy by any means and over all facilities connected therewith as parts of a system of power transmission situated in more than one state * * *". Hon. Clyde L. Seavey, Chairman of the House Committee on Interstate and Foreign Commerce, stated in respect to the House bill, "The new Title II of this Act is designed to secure coordination on a regional scale of the nation's power resources and to fill the gap in the present state regulation of electric utilities. It is conceived entirely as a supplement to, and not as a substitution for State Regulation." See Hearings on H.R. 5423 before the House of Representatives Committee on Interstate and Foreign Commerce, 74th Cong., 1st Sess. Part I, p. 384. As Jersey Power states, there was opposition to this bill and to the corresponding bill introduced in the Senate. The opposition took the position that proposed legislation should be confined to matters beyond the power of state regulatory agencies. See Hearings, Committee on Interstate and Foreign Commerce, House of Representatives, 74th Cong., 1st Sess., H.R. 5423, Part 3, p. 1623 ff. Thereafter the Senate Committee in charge of the legislation in that body reported out a new bill S. 2796, Sections 201 (a) and (b) of which were comparable to Section 201(a) of S. 1725. These new sections declared the business " * * * of generating, transmitting, and selling electric energy for ultimate distribution to the public is affected with a public interest", and declared also that federal regulation of the transmission and sale of electric energy in interstate commerce "and [of] the generation of electric energy for such transmission and sale * * *" was necessary in the public interest. Subsection (a) of the new Senate bill further stated that it was the policy of Congress to extend federal regulation to those matters which could not be regulated by the states and to assist the states in the exercise of their regulatory powers without impairing or diminishing the authority of any state commission. Section 201(b) of S. 2796 provided that the provisions of Part II should be applied to the transmission of electric energy, to its sale at wholesale in interstate commerce, and, "to the production of electric energy for such transmission or sale." It stated that the Commission should have jurisdiction over all facilities "for such production, transmission or sale of electric energy by any means and over all facilities connected therewith as parts of a system of power transmission situated in more than one state, except facilities used only for the production or transmission of electric energy in intra state commerce or in local distribution * * *".

It is to be noted that in S. 2796 there were inserted for the first time provisions protecting the regulatory powers of the states. Generating facilities employed for the creation of electricity to be used in interstate commerce remained subject to the Commission's jurisdiction as did all facilities connected with such generating facilities as parts of interstate transmission systems.

In the report of the Committee on Interstate Commerce submitted to the Senate by Senator Wheeler (see S.Rep.No. 621, 74th Cong., 1st Sess. pp. 17, 18 and 19) it is stated:

"The new part 2 of the Federal Water Power Act would constitute the first assertion of Federal jurisdiction over this major interstate public utility. The decision of the Supreme Court in Public Utilities Commission v. Attleboro Steam & E. Co. (273 U.S. 83 [47 S.Ct. 294, 71 L.Ed. 549]) placed the interstate wholesale transactions of the electric utilities entirely beyond the reach of the States. Other features of this interstate utility business are equally immune from State control either legally or practically.

*      *      *      *      *

" * * * The revision has also removed every encroachment upon the authority of the States. The revised bill would impose Federal regulation only over those matters which cannot effectively be controlled by the States. The limitation on the Federal Power Commission's jurisdiction in this regard has been inserted in each section in an effort to prevent the expansion of Federal authority over State matters. * * *"

Thereafter in the House of Representatives alterations were insisted upon and Sections 201(a) and (b) of the Act were set forth substantially in their present form. It will be noted that in the House amendments jurisdiction of the Commission over generating facilities and "fa-

cilities connected therewith as parts of a system of power transmission situated in more than one state" were not expressly included.

The report accompanying the bill in the House (74th Cong., 1st Sess. House Report No. 1318) offered by Representative Rayburn, states, pp. 7 and 8:

"The new parts are designed to meet the situation which has been created by the recent rapid growth of electric utilities along interstate lines. The percentage of electric energy generated in the United States that was transmitted across State lines increased from 10.7 in 1928 to 17.8 in 1933. The amount of energy transmitted in interstate commerce in 1933 was greater than all of the energy generated in the country in 1913. Under the decision of the Supreme Court of the United States in Public Utilities Commission v. Attleboro Steam & E. Co. (273 U.S. 83 [47 S.Ct. 294, 71 L.Ed. 549]), the rates charged in interstate wholesale transactions may not be regulated by the States.

\* \* \* \* \*

"The bill takes no authority from State commissions and contains provisions authorizing the Federal Commission to aid the State commissions in their efforts to ascertain and fix reasonable charges. Provision is made for joint boards composed of members of State commissions which may be used for this purpose. The new parts are so drawn as to be a complement to and in no sense a usurpation of State regulatory authority and contain throughout directions to the Federal Power Commission to receive and consider the views of State commissions. Probably, no bill in recent years has so recognized the responsibilities of State regulatory commissions as does title II of this bill."

The statement of the House Conferees accompanying the Conference Report upon S. 2796 offered by Representative Rayburn, Chairman of the House Conferees, (74th Cong., 1st Sess., House Report No. 1903, p. 74) says, "The Senate bill in section 201(a) contained a somewhat more lengthy declaration of policy than the House amendment, the only material difference being that the House amendment contained no reference to 'generation' of electric energy which appeared in the Senate bill. The conference substitute follows the language of the House amendment but inserts a clause relating to gen-

eration to the extent regulation thereof is provided for in this part and the part next following. The House amendment and conference substitute also makes reference to the 'sale of electric energy at wholesale in interstate commerce' which reference did not appear in the Senate bill. The same general differences between the Senate bill and the House amendment also appear in section 201(b) and the language of the House amendment has been followed with a clarifying phrase added to remove any doubt as to the Commission's jurisdiction over facilities used for the generation and local distribution of electric energy to the extent provided in other sections of this part and the part next following."

As we have said Section 201(a) of the Act states explicitly that the federal regulation proposed by the Act is intended "to extend only to those matters which are not subject to regulation by the States", and that Section 201(b) says with equal clarity that the Commission "shall not have jurisdiction \* \* \* over facilities used for the generation of electric energy or over facilities used in local distribution or only for the transmission of electric energy in intrastate commerce, \* \* \*." Generation of electricity, its local distribution or its transmission in intrastate commerce are not within the purview of the Act or the jurisdiction of the Commission. But the contentions of the petitioners in respect to the effect of the legislative history of Part II lose much of their potency when we contemplate the provisions of Section 201(c) which state that electricity shall be held to be transmitted in interstate commerce if transmitted from a state and consumed outside that state. Section 201(c) of the Act was in the original bill submitted to the Senate and the House of Representatives and came into the law substantially without change. That section fits well into the law as laid down by the decision of the Supreme Court in Public Utilities Comm. v. Attleboro Steam & Electric Co., 273 U.S. 83, 47 S.Ct. 294, 71 L.Ed. 549, and takes away, we think, the force of the argument of unconstitutionality made on behalf of the petitioners, at least insofar as the application of Section 201 of the Act to Jersey Central is concerned. The provisions of Part II were intended by Congress to be applied only to electrical energy transmitted in inter-

state commerce and in this field there can be no doubt that Congress possesses the constitutional right to legislate. See Northern Securities Company v. United States, 193 U.S. 197, 24 S.Ct. 436, 48 L. Ed. 679.

It follows that what we are concerned with in the appeals at bar is ascertaining the intention of Congress. We think that Congress intended to impose regulation upon those public utilities which operate facilities for the transmission of electricity in interstate commerce, transmission in interstate commerce being defined as electricity transmitted from a state and consumed at any point outside its borders.

An objection raised by the petitioners to the jurisdiction of the Commission lies in the small quantities of electricity which pass from Jersey Central's generating plant at South Amboy through the Public Service bus-bar into the lines of the Staten Island Company and the fact that this electricity was not paid for by any consideration passing from the Staten Island Company to Jersey Central. There were no commercial transactions whatsoever between the Staten Island Company and Jersey Central. Jersey Power takes the position that insofar as economy-flow current passed between Jersey Central and Public Service on the one hand and Public Service and Staten Island on the other, the respective arrangements for this current had no relation to or effect upon the non-participating company and that Jersey Central supplied only such current as Public Service otherwise would generate for its own use.

Some part of the electricity passing from the Jersey Central system to the Public Service system moved in interstate commerce and reached the Staten Island Company. That electric energy was transmitted in interstate commerce within the meaning of Section 201(c) if the words of the subsection be applied literally. The facilities of Jersey Central were in fact employed for this transmission. This was not an accident. Once the circuit between the Jersey Central generating plant and the Staten Island Company was closed, inevitably electricity flowed from Jersey Central to the Staten Island Company. That result was not only not unexpected, it was unavoidable. The fact that Jersey Central sold this

electricity to Public Service rather than to Staten Island does not serve to put the flow out of commerce. Once electricity flowed from the Jersey Central generating plant to the Staten Island Company, commercial transactions between the three companies under their respective contractual relations and arrangements followed. This was interstate commerce within the meaning of the Commerce Clause, Const. art. 1, § 8, cl. 3. For an analogy see the decisions of the Supreme Court in Eureka Pipe Line Company v. Hallanan, 257 U.S. 265, 42 S.Ct. 101, 66 L.Ed. 227, and United Fuel Gas Co. v. Hallanan, 257 U. S. 277, 42 S.Ct. 105, 66 L.Ed. 234. We do not think that it is important that the electricity which was transmitted is designated as emergency, economy-flow, incidental or slop-over current. It is electricity which is transmitted from New Jersey to New York when circuits are closed. We conclude, therefore, that the transmission of current which reached the Staten Island Company by Jersey Central over its facilities was such transmission as is described in the second sentence of Section 201(b). It follows that Jersey Central is a public utility within the meaning of Section 201(e) of the Act.

As we have indicated it was the intention of Congress in passing Part II of the Act to extend federal regulation to the transmission of electricity in interstate commerce. But by Section 201(a) Congress made it plain that such regulation was to extend only to those matters which were not subject to regulation by the states. The petitioners point out that the transfer of stock with which we are concerned was approved by the Board of Public Utility Commissioners of New Jersey in the exercise of the authority granted to the Commissioners by the law of New Jersey. R.S.1937, 48:2–13, N.J.S.A. 48:2–13.

The sale of the Jersey Central stock to Jersey Power properly was subject to regulation by the State of New Jersey because Jersey Central was engaged in intrastate commerce in that it supplied electricity to local consumers within the State of New Jersey. The sale was subject to the jurisdiction of the Federal Power Commission because Jersey Central is a public utility within the meaning of Section 201(e). We must consider the point of dual control but only insofar as it may be applicable to the ap-

peals at bar, in view of the provisions of Section 201(a) restricting federal regulation, and the legislative history of Part II of the Act. The authority of the Board of Public Utility Commissioners of New Jersey must be deemed to be paramount in those matters which may affect the intrastate transmission of electricity and the authority of the Federal Power Commission must be deemed to be governing as to those matters which may affect the transmission of electric energy in interstate commerce. We cannot presume a conflict between the two regulatory bodies upon the issue of whether or not Jersey Power should have bought the stock of Jersey Central. No conflict is shown upon the present record and none may ever come into existence.

The determination of the Commission is affirmed.