## UNITED STATES *v.* PUBLIC UTILITIES COMMISSION OF CALIFORNIA ET AL.

NO. 205.

Argued January 14, 1953.—Decided April 6, 1953.

*Solicitor General Cummings* argued the cause for the United States in No. 205. With him on the brief were *Assistant Attorney General Baldridge, Robert L. Stern, Paul A. Sweeney* and *Melvin Richter.*

*L. E. Blaisdell* argued the cause and filed a brief for petitioner in No. 206.

*Boris H. Lakusta* argued the cause for respondents in No. 205. With him on the briefs were *Everett C. McKeage* and *Wilson E. Cline* for the Public Utilities Commission of California, respondent in Nos. 205 and 206.

*Henry W. Coil* argued the cause for respondents in No. 206. With him on the briefs was *Donald J. Carman* for the California Electric Power Co., respondent in Nos. 205 and 206.

MR. JUSTICE REED delivered the opinion of the Court.

Respondent California Electric Power Company produces electricity in California, partially by hydroelectric projects licensed under Part I of the Federal Power Act, 41 Stat. 1063, as amended by Title II of the Public Utility Act of 1935, 49 Stat. 838, 16 U. S. C. § 791a *et seq.,* and markets the greater portion of it, subject to respondent Public Utilities Commission's authority, in that State. The jurisdictional dispute which is our present concern relates only to certain power sales by the Company to the Navy Department and to Mineral County, Nevada, for consumption there. This power, following production, is transmitted at 55,000 volts to the Company's Mill Creek substation in California, about 25 miles from the border, on its own lines. There it is figuratively taken over by the Navy and by the County, and delivered on their lines at the same high voltage to Hawthorne, Nevada, where it is stepped down for local distribution

and consumption. The Navy's power is used at its ammunition depot, largely in official industrial operations; between 15% and 29%, however, is distributed for consumption in the private households and enterprises of tenants at the Navy's low-cost housing project nearby. These sales are metered individually and each purchaser is billed according to his own use. The power purchased by the County is all resold to local consumers, with the exception of minor line losses and official use.

The Navy's contract for purchase of the power was negotiated in 1943, and provided for termination on 60-day notice; the County's was entered into in 1945 for a stated period of three years. In 1947 the Power Company applied to the State Commission for a general rate increase which, after hearings at which the Navy was represented, was granted. Thereafter, the Company terminated its Navy contract and failed to renew that with the County, giving notice of its intention to apply the new schedule to these sales. Both purchasers demurred, and the Company reapplied to the State Commission for a ruling as to the applicability of the general schedule to these particular operations. After some early state exploratory hearings, the Federal Power Commission, on February 15, 1950, issued an order to the Company to show cause as to why the rates were not subject to exclusive federal jurisdiction. Thus joined, the issues were heard by both agencies at a joint proceeding on March 20 and 21, 1950. Both eventually decided in favor of their own asserted authority.[1] The State

---

[1] *California Electric Power Co.*, 50 Cal. P. U. C. 749, and *California Electric Power Co.*, 89 P. U. R. (N. S.) 359, respectively.

There was some doubt as to the effect of the apparently conflicting orders, reflecting on the wisdom of our exercise of the power to review. The respondents contend that the state order merely permitted, but did not require, application of the higher rates to the Navy and County sales. The distinction, whatever its abstract

Commission's supporting opinion was denied review by the California Supreme Court on January 21, 1952, thus affirming its holding, while that of the Federal Power Commission was likewise approved by the Federal Court of Appeals for the Ninth Circuit, *California Electric Power Co.* v. *Federal Power Commission,* 199 F. 2d 206. As a federal question concerning the applicability of Part II of the Act was raised, certiorari was granted, 344 U. S. 810, to bring the record here from the state proceedings under 28 U. S. C. § 1257 (3).

## I.

Federal authority, which we think obtains, is asserted under Part II of the Federal Power Act. This applies "to the transmission of electric energy in interstate commerce and to the sale of electric energy at wholesale in interstate commerce." § 201 (b). Regulation of the rates of such sales—other types of authority in connection with such interstate transmission operations are granted in other sections—rests on §§ 205 (a) [2] and 206 (a). [3]

---

attraction, misses the point that we are here considering whether or not the state agency had jurisdiction at the outset to consider these rates at all. That the order would have no concrete effect on the prices petitioners must pay is irrelevant and unlikely as well.

The Federal Power Commission merely ordered the Company to cease charging other than filed rates and so, while constituting a determinative assertion of its jurisdiction, apparently does not foreclose the submission of a new schedule, with usual rate-making procedures before the federal body. 18 CFR §§ 35.3, 35.5, 35.20.

[2] § 205 (a): "All rates and charges made, demanded, or received by any public utility for or in connection with the transmission or sale of electric energy subject to the jurisdiction of the Commission, and all rules and regulations affecting or pertaining to such rates or charges shall be just and reasonable . . . ."

[3] § 206 (a): "Whenever the Commission, after a hearing had upon its own motion or upon complaint, shall find that any rate, charge, or classification, demanded, observed, charged, or collected by any

The preliminary issue as to whether the operations in question fall within the concept of interstate commerce, on which the federal power initially depends, can be shortly disposed of, for *Powell* v. *United States Cartridge Co.,* 339 U. S. 497, 509–515, firmly established that commerce includes the transportation of public property, while the irrelevance of the fact that this electricity is transmitted across the state boundary over lines owned by the Navy and by the County, as purchasers, may be seen from *Jersey Central Power & Light Co.* v. *Federal Power Commission,* 319 U. S. 61, 69, 71, and *Illinois Gas Co.* v. *Public Service Co.,* 314 U. S. 498.

The most serious contentions pressed in opposition to application of Part II, arise from the self-limiting statement therein that the Act is "to extend only to those matters which are not subject to regulation by the States." [4] So respondents contend that Power Commis-

---

public utility for any transmission or sale subject to the jurisdiction of the Commission, or that any rule, regulation, practice, or contract affecting such rate, charge, or classification is unjust, unreasonable, unduly discriminatory or preferential, the Commission shall determine the just and reasonable rate, charge, classification, rule, regulation, practice, or contract to be thereafter observed and in force, and shall fix the same by order."

[4] § 201 (a): "It is hereby declared that the business of transmitting and selling electric energy . . . is affected with a public interest, and that Federal regulation of matters relating to . . . the transmission of electric energy in interstate commerce and the sale of such energy at wholesale in interstate commerce is necessary in the public interest, such Federal regulation, however, to extend only to those matters which are not subject to regulation by the States."

Section 201 (b) states, in apparently similar vein, that the Act is not to "deprive a State or State commission of its lawful authority now exercised over the exportation of hydroelectric energy which is transmitted across a State line." The provision certainly does not go beyond that of § 201 (a), noted in the opinion, in limiting federal

sion jurisdiction only begins where the local regulatory power ends, and point to Part I, § 20, as supporting their contention that the limitation applies to the facts of this case. Section 20 provides that when power from projects licensed under Part I, which that energy sold to the Navy and the County includes,

> "shall enter into interstate or foreign commerce the rates . . . and the service . . . by any . . . licensee . . . or by any person, corporation, or association purchasing power from such licensee for sale and distribution or use in public service shall be reasonable . . . to the customer . . . and whenever any of the States directly concerned has not provided a commission or other authority to enforce the requirements of this section within such State . . . or such States are unable to agree through their properly constituted authorities on the services . . . or on the rates . . . jurisdiction is hereby conferred upon the commission . . . to regulate . . . so much of the services . . . and . . . rates . . . therefor as constitute interstate or foreign commerce . . . ."
> 41 Stat. 1073, 16 U. S. C. § 813.

Both Nevada and California have regulatory agencies with certain rate powers. And we may assume, though the Government asserts otherwise, that both agencies can enforce reasonable rate orders and have not dis-

authority. This is true, not only because of the substantial similarity of the language, but also because it appears not to have been drafted with state rate regulation in mind. Rather, 79 Cong. Rec. 10527 indicates that the provision was intended to preserve the validity of certain state statutes prohibiting or regulating the volume of state power exported. Compare S. 2796, 74th Cong., 1st Sess., as introduced, § 201 (b), and *idem* as reported in the House, Union Calendar No. 451, § 201 (b). It has been so construed. *Safe Harbor Water Power Corp.*, 5 F. P. C. 221, 235.

agreed.[5]   Respondents point to this as satisfying § 20,
and thus ousting any Part II regulation.   In short, they
contend—what at first blush may appear anomalous—
that federal rate jurisdiction under Part II may be pro-
hibited by the fact that some portion of the power sold
originated in hydroelectric projects federally licensed
under Part I.   We do not agree.

Admittedly, § 20 contemplated state regulation.   And
it may well be, as indicated by the congressional hear-
ings,[6] that Congress quite frankly chose the local authori-
ties to regulate the bulk of interstate sales of elec-
tricity from licensed projects.   In fact, a contrary view
would have been almost astonishing as an historical prop-
osition, for neither the large interstate operations of elec-
tric utilities that have developed during the last thirty
years, nor the concomitant desirability of federal regula-
tion, could have been foreseen in 1920.   Long-range trans-
mission was not then adequately developed, nor had the
various local utilities by then undergone the integration
into large centralized systems which later came about.[7]
So we may assume that Congress, as a policy judgment,
accepted and adapted the substantial tradition of local

[5] Section 20's reference to state agreement has never been wholly
clear.   See footnotes 13, 16 and 19, *infra.*   Our opinion, *Pennsylvania
Water & Power Co.* v. *Federal Power Commission,* 343 U. S. 414,
did not settle the issue, and it has been judicially discussed only
rarely.

[6] Hearings, House Committee on Water Power, 65th Cong., 2d
Sess. 65.

[7] It was, of course, more than historical accident that caused the
simultaneous passage of the Holding Company Act and the Federal
Power Act; in fact, their mutual consideration by the 79th Congress,
1st Sess., see 79 Cong. Rec. *passim,* strikingly indicates Congress'
realization that state regulation had failed, both because of the
giantism of the holding company and because of inability to reach
interstate sales.   See Davis, Influence of Federal Trade Commission's
Investigations, 14 Geo. Wash. L. Rev. 21.

utility regulation to power production licensed under the federal Act.

But there is no evidence that this was done with any firm intent to settle with the states a power essentially national. For whatever views of the draftsmen of § 20 as to the efficacy of state regulation, the jurisdictional lines between local and national authority were not finally determined until this Court's opinion in *Public Utilities Commission* v. *Attleboro Steam & Electric Co.*, 273 U. S. 83. This decision followed the Federal Water Power Act by some seven years. In short, that case established what has unquestionably become a fixed premise of our constitutional law but what was not at all clear in 1920, that the Commerce Clause forbade state regulation of some utility rates. State power was held not to extend to an interstate sale "in wholesale quantities, not to consumers, but to distributing companies for resale to consumers." 273 U. S., at 89. *Attleboro* reiterated and accepted the holding of *Pennsylvania Gas Co.* v. *Public Service Commission,* 252 U. S. 23, that sales across the state line direct to consumers is a local matter within the authority of the agency of the importing state. But it prohibited regulation of wholesale sales for resale by either interested commission.

Respondents seek to escape that doctrine, however, by pointing to the fact that there was not there involved sales of electricity produced at a project licensed under Part I. They admit that absent § 20 of that Part, the later Part II authority would apply exclusively and determine the result. But, they say, § 20 creates an exception, which the language of *Attleboro* did not reach, for hydroelectric energy transmitted across state lines under the aegis of coordinated state regulation. In short, it is alleged that § 20 "conferred jurisdiction" on the states.

We do not agree. *Attleboro* declared state regulation of interstate transmission of power for resale forbidden as a direct burden on commerce. The states may act as to such a subject only when Congress has specifically granted permission for the exercise of this state power over articles moving interstate which would otherwise be immune. *In re Rahrer,* 140 U. S. 545, 560–562.[8]   Section 20 cannot bear this interpretation; it did not establish the source of the energy as a significant factor determining whether state or ·federal authority applied.   It is quite different from those few unique federal statutes this Court has heretofore considered, "subjecting interstate commerce . . . to present and future state prohibitions," or regulation, *Clark Distilling Co.* v. *Western Maryland R. Co.,* 242 U. S. 311, 326, in the exercise of the constitutional commerce power.   Its language indicates no consideration or desire to alter the limits of state power otherwise imposed by the Commerce Clause; it merely states that the federal power shall not be invoked unless certain conditions of state inability to regulate obtain.[9]   Section 20 quite obviously is not based on any recognition of the constitutional barrier, but rather assumes what *Attleboro* held did not exist—state authority to reach interstate sales of energy for resale; its sole concern is the application of federal regulation on the possible failure of the

---

[8] See *Leisy* v. *Hardin,* 135 U. S. 100; *Adams Express Co.* v. *Kentucky,* 238 U. S. 190; *Rosenberger* v. *Pacific Express Co.,* 241 U. S. 48; *Clark Distilling Co.* v. *Western Maryland R. Co.,* 242 U. S. 311; *Whitfield* v. *Ohio,* 297 U. S. 431; *Kentucky Whip & Collar Co.* v. *Illinois Central R. Co.,* 299 U. S. 334, 350.

[9] Compare the Wilson Act, 26 Stat. 313 (alcoholic beverages), the Webb-Kenyon Act, 37 Stat. 699, 27 U. S. C. § 122 (same); 32 Stat. 193 (oleomargarine); the Reed Amendment to the National Appropriation Act of 1917, 39 Stat. 1069 (alcoholic beverages); the Hawes-Cooper Act, 45 Stat. 1084, 49 U. S. C. § 60; and the Ashurst-Sumners Act, 49 Stat. 494, 18 U. S. C. §§ 1761, 1762 (convict-made goods).

states to empower their regulatory agencies or their inability to agree.

Nor can it soundly be said that Congress in § 20 of Part I charged the states with responsibility of regulating rates of interstate sales of electricity through the use of the federal power over government property. U. S. Const., Art. 4, § 3, cl. 2. As indicated in our discussion of the commerce power, there was in 1920 when § 20 was enacted no full appreciation of the limits of state power over sales of electricity for export or import for resale. So the language of § 20 required reasonable rates to consumers of electricity moving interstate and then added the provision that when no state commission was provided to enforce reasonable rates, or the states interested could not agree, the Federal Power Commission could act.[10] We do not think such an arrangement for water

---

[10] Hearings, House Committee on Water Power, 65th Cong., 2d Sess. 62–66, 95–97, is most illuminating in this regard. O. C. Merrill presented the views of the Secretaries of Agriculture, Interior and War. He discussed at some length the problem of sales across state lines and suggested that the proposed § 20 solution was desirable. It left regulation to the interested states "if they do it; and they are doing it now." *Ibid.*, at 97. "The intention of the draft was this: That in so far as the local authorities have the power, and exercise it, over rates and service, the Federal commission should leave it alone." *Ibid.*, at 62. There is no suggestion that § 20 was conceived as an act of federal permission; indeed Merrill explicitly states his ignorance as to whether any permission was needed: "I do not know whether the question has even come before the courts as to whether such business is or is not interstate commerce, within the meaning of the commerce clause of the Constitution, so that exclusive jurisdiction would be vested in the Federal Government, if it wished to exercise it." Mr. Doremus: "It might be a power which Congress could exercise, or, if it failed to exercise it, could be left in the jurisdiction of the State." Mr. Merrill: "It is my judgment that so long as it is satisfactorily handled by the several States it had better be left with them." *Ibid.*, at 97.

power electricity as Part I, § 20, provides can be held to block the general authority of Part II. See note 13, *infra*.

The actions of the Congress following the *Attleboro* decision do not reflect any different interpretation of § 20. We note some interest in the application of that section in the light of the opinion, but nothing that is decisive of respondents' contentions. In 1929, Senator Couzens introduced an amendment to his then pending bill, S. 6, 71st Cong., 1st Sess., to establish federal regulation of communications. The amendment, § 47 *et seq.*, would have established a federal rate authority over all interstate power sales. "Power" was defined, § 47 (a) (4), to include electric energy, "whether or not produced by a licensee under the Federal Water Power Act." The bill was referred to Committee, but Congress took no final action.[11] In the next year, the same Committee held hearings on S. Res. 80, concerning a purported breakdown in the investigative powers of the Federal Power Commission as it then was constituted. The decision of the Commission of February 28, 1929, reported F. P. C. Ninth Ann. Rep. 119, was introduced.[12] This argued that, as a result of *Attleboro*, the Commission had exclusive jurisdiction over rates of interstate wholesale-for-resale sales of licensed hydroelectric power, until displaced by a § 20 agreement of the

---

[11] See Hearings, Senate Committee on Interstate Commerce on S. 6, 71st Cong., 2d Sess. Section 47 (h) stated that the purpose of the amendments was not to "abridge the jurisdiction or authority of any State to regulate, to the same extent as if this Act had not been passed, the rates and charges for the sale to consumers within the State of any power transmitted in interstate commerce," unless a "substantial number" of those consumers sought federal regulation.

[12] Hearings, Senate Committee on Interstate Commerce on S. Res. 80, 71st Cong., 2d Sess. 265.

interested states which received congressional approval as a compact.[13]

The first positive congressional action in the field, of course, was the Federal Power Act of 1935. The sweep of the statute is wholly inconsistent with any asserted state power as fixed by § 20 of the 1920 Act. We have examined the legislative history; its purport is quite clear. Part II was intended to "fill the gap"—the phrase is repeated many times in the hearings, congressional debates and contemporary literature—left by *Attleboro* in utility

---

[13] "In cases of interstate and foreign commerce of the character illustrated in the Pennsylvania Gas Co. case [direct sales to consumers], *supra*, I [the Chief Counsel of the Commission; the Commission approved the statement as its own Decision February 28, 1929] am of the opinion that the Federal Power Commission has no jurisdiction over any matter for the regulation of which the State has already provided a commission with the requisite authority. This appears to be the very situation which Congress had in mind when it conferred a conditional jurisdiction upon the commission. If such a State commission does not exist, the jurisdiction of the Federal Power Commission applies in full. If the State has a commission with authority over a part only of the matters specified in section 20, the jurisdiction of the Federal Power Commission extends to the remainder of such matters.

"In cases of interstate and foreign commerce of the character illustrated in the Attleboro case, *supra*, it seems clear that the States individually have no jurisdiction at all; that having no individual jurisdiction they can not acquire it jointly by agreements between themselves, except by specific authorization of Congress in the manner hereinafter discussed; and that, in absence of such authorization, the only ·agency with authority to regulate, in cases of this kind, the specific matters set forth in section 20 is the Federal Power Commission." F. P. C. Ninth Ann. Rep. 123–124.

The Report went on to state that § 20 could not be interpreted as a "permissive" statute. *Ibid.*, 127–129. The "compact" interpretation of § 20 was adopted in *Safe Harbor Water Power Corp.* v. *Federal Power Commission,* 124 F. 2d 800.

· See footnote 16, *infra.*

regulation. Congress interpreted that case as prohibiting state control of wholesale rates in interstate commerce for resale, and so armed the Federal Power Commission with precisely that power.[14] There is nothing to indicate that Congress' conception of the states' disability in 1935, or of the power it gave the Commission by Part II, did not include Part I electricity. In fact, the unqualified statements concerning Part II favor the opposite construction, for we find the Act explained time and again as empowering the agency with rate authority over interstate wholesale sales for resale; not once is this authority spoken of as one conditioned on the electricity concerned having been produced by steam generators or at nonlicensed dams.[15]

This would largely determine our interpretation of the ambiguous reference to "matters . . . subject to regula-

[14] The conception of the Federal Commission's new function was perhaps more revolutionary than could be gathered by merely comparing the new Act with § 20. For it appears that despite the latter provision for limited rate regulation, in fact substantially nothing in that direction had been attempted, at least by 1930. Hearings, Senate Committee on Interstate Commerce on S. Res. 80, 71st Cong., 2d Sess. 79, 262. The Commission had only three accountants, all of whom were concerned with evaluation of proposed licensed hydroelectric projects. *Ibid.*, 38.

In fact, Colonel Tyler, Chief Engineer, Federal Power Commission, expressly alluded to the fact that, for federal authority to be effective, it would have to reach all interstate electricity, and not just that which is produced at licensed dams. *Ibid.*, at 195. Here, of course, respondents theorize that a small admixture of hydroelectric power will defeat federal jurisdiction.

[15] In fact, the House Report on the bill, commenting on § 305 of the Act, stated that specific reference to officials of licensees had been deleted because "such licensees when interstate operating public-utility companies will be subject to the provisions of the section in any event." H. R. Rep. No. 1318, 74th Cong., 1st Sess. 31.

For general discussion of the scope of Part II, see Hearings, Senate Committee on Interstate Commerce on S. 1725, 74th Cong., 1st

tion by the States," § 201 (a), if nothing more were available to work with. However, there is other proof that Congress did not have in mind § 20-type state regulation. The limiting clause is spoken of only as protecting state regulation of local affairs, including rates of intrastate and interstate-for-consumption sales: "Facilities for local distribution and for the production and transmission of energy solely for one's own use and not for resale are excluded." Hearings, House Committee on Interstate and Foreign Commerce on H. R. 5423, 74th Cong., 1st Sess. 385.[16] The phrase is not once mentioned as the distinct affirmation of state power over interstate sales for resale under § 20 that respondents apparently would recognize it to be. There are indeed further reasons for rejecting respondents' construction of § 201 (a). The nature of the generating facilities, in the first place, has no functional significance for rate regulation; the same considerations that lead Congress to enact federal authority over interstate electricity in general would have been similarly applicable to power generated at licensed projects. Secondly, contemporary literature was frankly divided over whether any power over interstate sales for

---

Sess. 250–251; H. R. Rep. No. 1318, 74th Cong., 1st Sess. 26–27; Hearings, House Committee on Interstate and Foreign Commerce on H. R. 5423, 74th Cong., 1st Sess. 436, 521–530, 549, 1639, 1677–1680, 2143, 2169; H. R. Rep. No. 1903, 74th Cong., 1st Sess. 74; 79 Cong. Rec. 8431, 8442, 8444, 10377–10378.

[16] "[T]his language [the § 201 (a) proviso clause] is not pertinent in the instant controversy for it is designed to be applicable only to electric energy transmitted and sold in intrastate commerce. The control of rates referred to in the section is control by a single State and the language has no relation to possible joint control by two or more States under the compact clause of the Constitution." *Safe Harbor Water Power Corp.* v. *Federal Power Commission,* 179 F. 2d 179, 187. See also *Hartford Electric Light Co.* v. *Federal Power Commission,* 131 F. 2d 953; *Jersey Central Power & Light Co.* v. *Federal Power Commission,* 129 F. 2d 183.

resale remained with the states after *Attleboro*.[17]  We cannot assume that Congress enacted Part II with the purpose of permitting the states to regulate hydroelectric energy through § 20.   This is especially so in view of the dearth of legislative discussion of the matter.[18]

So we conclude that the limitations of § 201 (a) on federal regulation cannot, and were not intended to, preserve an exclusive state regulation of wholesale hydroelectric sales across state borders.   Even if we conceived of the matter as one peculiarly limited to the statutory wording of § 201 (a), our statement that "[e]xceptions to the primary grant of jurisdiction in the section are to be strictly construed," *Interstate Natural Gas Co.* v. *Federal Power Commission,* 331 U. S. 682, 690–691, would be as applicable here as to § 1 (b) of the Natural Gas Act. "Production" and "distribution" are elsewhere specifically excluded from Commission jurisdiction, § 201 (b) ; the phrase relied on in § 201 (a) was originally drafted as a

[17] Scott, Control of Power Transmission, 14 Proc. of Acad. of Pol. Sci. 135, followed by Note, 32 Col. L. Rev. 1171, admit the force of *Attleboro,* but cite § 20 as a permissive regulation statute.   On the other hand, Arneson, Federal Regulation of Electric Utilities, 66 U. S. L. Rev. 133, and Updegraff, Extension of Federal Regulation of Public Utilities, 13 Iowa L. Rev. 369, hold that the states' power to regulate rates of sales for resale in interstate commerce was completely wiped out.

[18] Actually, an exception to federal commission authority for power generated at licensed hydroelectric projects would have had little real significance in 1935, in terms of limiting resort to that authority. Forty percent of the Nation's electric energy was produced at hydroelectric projects.   F. P. C. Electric Power Statistics, 1920–1940, pp. VIII–IX.   But only 12.3% of the total production came from licensed sources, which had merely 7.8% of the total national capacity.   (Letter from Leon Fuquay, Secretary, Federal Power Commission, to Edward G. Hudon, Assistant Librarian, United States Supreme Court, March 16, 1953.)   It would have been curious for Congress to have approved a very special type of regulatory scheme for such a minimal fraction of the country's total power.

declaration of "policy," and the rewording which gave it its present more succinct form was unaccompanied by any "mention [of] this change as one of substance." *Jersey Central Power & Light Co.* v. *Federal Power Commission,* 319 U. S. 61, 76, referring to H. R. Rep. No. 1318, 74th Cong., 1st Sess. 26. "It cannot nullify a clear and specific grant of jurisdiction, even if the particular grant seems inconsistent with the broadly expressed purpose." *Connecticut Light & Power Co.* v. *Federal Power Commission,* 324 U. S. 515, 527. To conceive of it now as a bench mark of the Commission's power, or an affirmation of state authority over any interstate sales for resale, would be to speculate about a congressional purpose for which there is no support.

Part II is a direct result of *Attleboro.* They are to be read together. The latter left no power in the states to regulate licensees' sales for resale in interstate commerce, while the former established federal jurisdiction over such sales. Discussion of the constitutional problem as reflected in that statute and the Natural Gas Act in recent cases supports this conclusion. Especially in the litigation arising under the Gas Act has this Court expressed the view that the limitations established on Commission jurisdiction therein were designed to coordinate precisely with those constitutionally imposed on the states. *Federal Power Commission* v. *Hope Natural Gas Co.,* 320 U. S. 591, 609–610; *Panhandle Pipe Line Co.* v. *Public Service Commission,* 332 U. S. 507, 514–515; *Interstate Natural Gas Co.* v. *Federal Power Commission,* 331 U. S. 682, 690–691; *Illinois Natural Gas Co.* v. *Public Service Co.,* 314 U. S. 498, 506.[19]

---

[19] *Safe Harbor Water Power Corp.,* 5 F. P. C. 221, 239–243. See also 18 CFR §§ 35.3, 35.20.

In view of our holding that § 20 does not, of itself, confer jurisdiction on the state commission or commissions in this case, we need not discuss the much-briefed contention that its conditions have

## II.

We turn next to a definitional problem raised by respondents, relating to the sales to Mineral County. In short, it is this: § 201 extends Commission jurisdiction to "sale of electric energy at wholesale in interstate commerce." Subsection (d) of that section states:

"The term 'sale of electric energy at wholesale' when used in this Part means a sale of electric energy to any person for resale."

And § 3 (4) [20] equates "person" with "individual or a corporation," while § 3 (3) [21] excludes municipalities defined in § 3 (7) [22] from the scope of the latter term. So respondents argue that the sales to Mineral County are neatly and decisively excluded from Part II rate regulation.

The use of these sections in support of an indirect exception to Part II has no support in the statutory scheme as a whole. Sections 306 and 313 (a), in fact, look quite the other way. They provide for complaints and petitions for rehearing by municipalities. And § 3 (7) contemplates municipalities as users and distributors of power. To accept respondents' contention as to Mineral

been met. See, however, *Safe Harbor Water Power Corp.* v. *Federal Power Commission,* 124 F. 2d 800, 179 F. 2d. 179; *Pennsylvania Water & Power Co.* v. *Federal Power Commission,* 343 U. S. 414; and notes 13 and 16, *supra.*

[20] " 'Person' means an individual or a corporation." § 3 (4).

[21] " 'Corporation' means any corporation, joint-stock company, partnership, association, business trust, organized group of persons, whether incorporated or not, or a receiver or receivers, trustee or trustees of any of the foregoing. It shall not include 'municipalities' as hereinafter defined." § 3 (3).

[22] " 'Municipality' means a city, county, irrigation district, drainage district, or other political subdivision or agency of a State competent under the laws thereof to carry on the business of developing, transmitting, utilizing, or distributing power." § 3 (7).

County would thwart the premise of these provisions: that such political subdivisions of the states can be aggrieved by the failure of a public utility selling power to them to satisfy the requirements of Part II.

Nor do we find any evidence of conscious coordination of §§ 3 (3), (4) and 201 (d) from the legislative history. True, they were simultaneously enacted, and, in fact, the interpolation of the word "person" into § 201 (d) occurred after the §§ 3 (3) and 3 (4) definitions were in existence in S. 2796, 74th Cong., 1st Sess., as passed by the Senate and reported to the House, June 13, 1935. But this alteration came at the insistence of the House. The Senate had provided for jurisdiction over sales occurring before or after interstate transmission, *ibid.*, § 201 (f), and the House amendment, from which § 201 (d) in its present form stemmed, covered sales during the transmission across state lines for the first time. So the House Report is, we think, significant in its redefinition of the section: "A 'wholesale' transaction is defined to mean the sale of electric energy for resale." H. R. Rep. No. 1318, 74th Cong., 1st Sess., p. 8. We conclude, therefore, that the Congress attached no significance of substance to the addition of the word "person," and in fact did not intend it as a limitation on Commission jurisdiction. Indeed quite the contrary was sought by the House amendment of § 201 (d).[23]

---

[23] There is evidence, on the other hand, that the exclusion of producing municipalities from Commission jurisdiction was intended. For instance, DeVane, Solicitor of the Federal Power Commission at the time, testified as follows before the Senate Committee:

"Mr. DeVane. [The Act] does not apply to a publicly owned power plant.

.        .        .        .        .

"Senator Hastings. Why was it drawn that way?

"Mr. DeVane. We did not feel that it was within our province to prepare a bill that would undertake to regulate municipal, State,

A third factor, in addition to the statutory scheme and legislative history of § 201 (d), is the rejection of respondents' contention by the Commission and courts. Three circuits have just recently done so,[24] and the Federal Power Commission's long assertion that it has authority over rates of sales to municipalities has probably risen to

or Government utilities." Hearings, Senate Committee on Interstate Commerce on S. 1725, 74th Cong., 1st Sess. 256.

And before the House Committee, Commissioner Seavey recorded a similar interpretation:

"Mr. PETTENGILL. Mr. Commissioner, you just said a moment ago that as you construed the bill, a private power line could not be required to carry electric energy generated by the Tennessee Valley Authority or a municipal plant owned by a city, or a State; is that correct?

"Commissioner SEAVEY. Yes; that is my understanding of the bill.

"Mr. PETTENGILL. Because, as you said, the word 'person' does not include a municipality or a governmental body?

"Commissioner SEAVEY. I think that municipalities are particularly excluded, and it is my belief that any other Federal agency, any other governmental agency, would be excluded under the terms of the bill.

"Mr. PETTENGILL. Now then, suppose that a municipality acquires, by purchase, all of the common stock of a corporation, privately organized, so that the municipality is actually the owner of the power plant, although it was organized privately, as a private corporation. After that was done, could the private power plant competing in the same locality be required to carry the electric energy generated by a plant owned by the municipality, or State, or the nation?

"Commissioner SEAVEY. If it was controlled by the municipality and was subject wholly to municipal operation, I would say no, there it not be [sic]." Hearings, House Committee on Interstate and Foreign Commerce on H. R. 5423, 74th Cong., 1st Sess. 397–398.

See § 201 (f).

[24] *California Electric Power Co.* v. *Federal Power Commission,* 199 F. 2d 206; *Wisconsin* v. *Federal Power Commission,* 91 U. S. App. D. C. 307, 201 F. 2d 183, and *Wisconsin-Michigan Power Co.* v. *Federal Power Commission,* 197 F. 2d 472.

the dignity of an agency "policy." [25] We have often stated our sympathy with established administrative interpretations such as this. Cf. *United States* v. *American Trucking Ass'ns*, 310 U. S. 534, 549.

Where the language and purpose of the questioned statute is clear, courts, of course, follow the legislative direction in interpretation. Where the words are ambiguous, the judiciary may properly use the legislative history to reach a conclusion. And that method of determining congressional purpose is likewise applicable when the literal words would bring about an end completely at variance with the purpose of the statute. *Texas & Pacific R. Co.* v. *Abilene Oil Co.*, 204 U. S. 426; *Feres* v. *United States*, 340 U. S. 135; *International*

---

[25] *Kansas Gas & Electric Co.*, 1 F. P. C. 536; *Otter Tail Power Co.*, 2 F. P. C. 134; *Los Angeles* v. *Nevada-California Electric Corp.*, 2 F. P. C. 104; *Connecticut Light & Power Co.*, 3 F. P. C. 132; Baum, The Federal Power Commission, 61–62. See the criticism of the § 201 (a) phrase as meaninglessly ambiguous, *Hartford Electric Light Co.*, 2 F. P. C. 359, and *Northwestern Elec. Co.*, 2 F. P. C. 327.

The Company has cited a brief by the Commission in another case with some force, as indicating that heretofore it has claimed that the United States is excluded from the Act by virtue of not being a "person." Respondent's brief, *U. S. ex rel. Chapman* v. *Federal Power Commission* (C. A. 4th Cir.), 191 F. 2d 796. We note, though, that the contention there was made 'in regard to the application of § 313 (a), that "no proceeding to review any order of the Commission shall be brought by any person unless such person" has applied to the Commission for a rehearing. The Court, however, chose to ignore the point, and rather held that the Secretary of the Interior could not petition for review in that case since he was not a "party aggrieved," § 313 (b). 191 F. 2d, at 799–800. On certiorari here, the Commission failed to press the "person" argument again, relying solely on the argument that petitioner, as a representative of federal interests, was not "aggrieved" by the Commission's order in support of its contention of lack of standing. Br. F. P. C. Nos. 28 and 29, 1952 Term, pp. 95–128. We did not consider the matter in our opinion. *United States* v. *Federal Power Commission*, 345 U. S. 153, 156.

*Union* v. *Juneau Spruce Corp.,* 342 U. S. 237, 243; *Johansen* v. *United States,* 343 U. S. 427, 432. So here, since it is our judgment that neither the legislative aim nor the realities of coordinated rate regulation compel it, we reject respondents' plea that the Federal Power Commission can exercise no authority over sales to Mineral County, and, for similar reasons, the Company's contention in No. 205 that the sales to the Navy are not sales to a "person."

### III.

The claim that the sales here occurred over "local distribution" facilities, § 201 (b), and were not "for resale" because the contracts did not state as much, are insubstantial. The sales were made in California but the facilities supplied "local distribution" only after the current was subdivided for individual consumers.[26] But a final question—whether the Federal Power Commission may exercise rate authority over the entire amount of power sold or merely that which is resold by the Navy and the County—requires rather more extended discussion.

Certainly the concrete fact of resale of some portion of the electricity transmitted from a state to a point outside thereof invokes federal jurisdiction at the outset, despite the fact that the power thus used traveled along its interstate route "commingled" with other power sold by the same seller and eventually directly consumed by the same purchaser-distributor. But the Government argues from this that all the power exchanged between the same parties over the same facilities is subject to Commission order, irrespective of whether resold or not. For this proposition it relies on an alleged similarity be-

---

[26] See *East Ohio Gas Co.* v. *Tax Commission of Ohio,* 283 U. S. 465; *Federal Power Commission* v. *East Ohio Gas Co.,* 338 U. S. 464, 469.

tween the problem as thus stated and that decided in *Pennsylvania Water & Power Co.* v. *Federal Power Commission,* 343 U. S. 414, 419.[27]  We held there that the federal rate authority must apply to all electricity sold, despite the fact that it was made up of power transmitted across state lines as well as that produced locally. The impossibility of separating interstate from intrastate electricity consumed by each purchaser is patent. In such a case, federal rate jurisdiction must attach to each distributor's negotiated agreement with the seller irrespective of occasional and unpredictable use of nonjurisdictional intrastate power.

There, however, the problem was whether the sales of electricity were in "interstate commerce." Here, it is a different one whether the entire sale is a "sale for resale." For purposes of this case, we need not decide the question of whether a somewhat similar "commingling"—of power resold with that consumed directly by the purchaser—requires entire federal jurisdiction. For, even assuming *arguendo* respondents' proposition that it may be proportionally limited, we hold that the record before us in this case does not present a set of facts or findings justifying that result. By the statute, Commission jurisdiction extends to "sales for resale," "but not to any other sale." § 201 (b). The problem, then, in applying respondents' suggested interpretation, is to decide just what power transaction falls within this category of "sale for resale"— whether one involving the entire volume of electricity transmitted to the Navy or merely that which the buyer resells to others; the determinant is the delineation of "sale for resale." See *Panhandle Pipe Line Co.* v. *Public Service Commission,* 332 U. S. 507, 516–517. Assuming respondents' theory, this would turn, of course, on

[27] See *California Electric Power Co.* v. *Federal Power Commission,* 199 F. 2d 206, 209.

whether an essentially separate transaction covering the power directly consumed by the purchaser is identifiable. The present record will not permit such a finding. It may be that as an engineering proposition, accurate measurement of the volume resold and the volume directly consumed by the two parties is possible for each billing period. But there is no record evidence of separate rates, separate negotiations, separate contracts or separate rate regulation by official bodies, in short that the "sales" themselves were separate, and it is in these terms that the Act would require us to fix the limits of the jurisdictional grant.[28] The attention of the Commission was not directed towards this matter. The question will not be ripe for our consideration until the California Commission has had an opportunity to perfect the record and to consider the problem.

*Reversed.*

MR. JUSTICE BLACK, concurring.

The question involved in both these cases is whether the Federal Power Commission or the Public Utilities Commission of California has power to regulate certain sales of electricity. The California Supreme Court here sustained an order of the State Commission regulating the sales. The Court of Appeals has sustained an order of the Federal Commission. *California Electric Power Co.* v. *Federal Power Commission,* 199 F. 2d 206. I agree

---

[28] The Ninth Circuit, in *California Electric Power Co.* v. *Federal Power Commission,* No. 495, now pending before us on a petition for certiorari, 199 F. 2d 206, with the more complete record before it from the Power Commission, held that *Penn Water* controlled. We do not decide the question but rather note that the Commission's own view of the matter may still be in the formative stage. See *Colorado Interstate Gas Co.* v. *Federal Power Commission,* 185 F. 2d 357; *City of Hastings* v. *Kansas-Nebraska Natural Gas Co.,* 12 F. P. C. 3, 98 P. U. R. (N. S.) 1.

with the Ninth Circuit for the reasons it gave and consequently concur here in reversal of the Supreme Court of California's contrary holding.

MR. JUSTICE JACKSON, concurring.

I should concur in this result more readily if the Court could reach it by analysis of the statute instead of by psychoanalysis of Congress. When we decide from legislative history, including statements of witnesses at hearings, what Congress probably had in mind, we must put ourselves in the place of a majority of Congressmen and act according to the impression we think this history should have made on them. Never having been a Congressman, I am handicapped in that weird endeavor. That process seems to me not interpretation of a statute but creation of a statute.

I will forego repeating what I have said about this practice in *Schwegmann Bros.* v. *Calvert Corp.,* 341 U. S. 384, 395. But I do point out that this case is a dramatic demonstration of the evil of it. Neither counsel who argued the case for the State Commission nor the Supreme Court of California had access to the material used by the Court today. Counsel for the Public Utilities Commission of that State stated at the bar, and confirmed by letter, that he had tried without success over a period of four months to obtain the legislative history of § 20 of Part I of the Federal Power Act. He obtained it only four days before argument, in Washington at the Library of this Court. He stated that the City and County Library of San Francisco, the Library of the University of California, and the library of the largest law office in San Francisco were unable to supply it. The City and County Library tried to obtain the material by interlibrary loan from the Library of Congress, but the request was refused. Counsel then attempted to ob-

tain the material from the Harvard Law School Library, but it advised that "our rules do not permit this kind of material to be sent out on loan."

The practice of the Federal Government relying on inaccessible law has heretofore been condemned. Some of us remember vividly the argument in *Panama Refining Co.* v. *Ryan,* 293 U. S. 388, in which the Government was obliged to admit that the Executive Orders upon which it had proceeded below had been repealed by another Executive Order deposited with the State Department. No regularized system for their publication had been established. Copies could be obtained at nominal cost by writing to the Department. Having discovered the error, the Government brought it to the attention of the Court. At the argument, however, the Court, led by Mr. Justice Brandeis, subjected government counsel to a raking fire of criticism because of the failure of the Government to make Executive Orders available in official form. The Court refused to pass on some aspects of the case, and the result was the establishment of a Federal Register.*

Today's decision marks a regression from this modern tendency. It pulls federal law, not only out of the dark where it has been hidden, but into a fog in which little can be seen if found. Legislative history here as usual is more vague than the statute we are called upon to interpret.

If this were an action to enforce a civil liability or to punish for a crime, I should protest this decision strenuously. However, the decision seems to have operation in the future only. If Congress does not like our legislation, it can repeal it—as it has done a number of times

---

*This history is set out in more detail in Jackson, Struggle for Judicial Supremacy, pp. 89–91.

in the past. I therefore concur in the interpretation unanimously approved by the members of the Court who have had legislative experience.

MR. JUSTICE FRANKFURTER.

The light shed by MR. JUSTICE JACKSON on the underpinning of the Court's opinion makes me unwilling to share responsibility for a decision resting on such underpinning. It is one thing to construe a section of a comprehensive statute in the context of its general scheme, as that scheme is indicated by its terms and by the gloss of those authorized to speak for Congress, either through reports or statements on the floor. It is a very different thing to extrapolate meaning from surmises and speculation and free-wheeling utterances, especially to do so in disregard of the terms in which Congress has chosen to express its purpose.

Were I confined to the mere text of the legislation we have to construe, with such authoritative elucidation as obviously relevant legislative materials furnish, I would be compelled to find the considerations for fusing, as the Court does, the amended Federal Water Power Act of 1920, 41 Stat. 1063, with Part II of the Federal Power Act of 1935, 49 Stat. 838, 847, too tenuous. In saying this I am wholly mindful of the significance of the decision in *Public Utilities Commission* v. *Attleboro Co.,* 273 U. S. 83. Preoccupation with other matters pending before the Court precludes an independent pursuit by me of all the tributaries in search of legislative purpose that the Court has followed. I am therefore constrained to leave the decision of this case to those who have no doubts about the matter.