**SEA–LAND SERVICE, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**Court No. 87–01–00066.**

United States Court of International Trade.

March 23, 1990.

Ragan & Mason (Gerald A. Malia, Washington, D.C., and Michael F. DiCroce), Alexandria, Va., for plaintiff.

Stuart M. Gerson, Asst. Atty. Gen., Washington, D.C., Joseph I. Liebman, Atty. in Charge, Commercial Litigation Branch, Intern. Trade Field Office (Mark S. Sochaczewsky) and Sheryl A. French, New York City, U.S. Customs Service, for defendant.

## OPINION

RESTANI, Judge:

This tariff classification matter is before the court for decision following trial. There are few issues of fact to be resolved. The basic dispute is one of law.

The product at issue is a container that may be utilized on a ship, a railroad car, or it may be attached to a truck or tractor. The parties have referred to the product as an "intermodal freight container," presumably because it can be used with all of the mentioned modes of transportation, without the necessity of reloading or repacking. *Accord* 10 *McGraw–Hill Encyclopedia of Science and Technology* (*McGraw–Hill*) 400 (6th Edition 1987).

The container at issue is a rectangular box thirty-five or forty feet long that weighs about sixty thousand pounds. The frame of the container is of steel and alu-

---

minum and is covered with aluminum sheeting. The container is insulated. A "Thermo King" (TK) unit is attached to the basic container box.[1] The TK unit is a temperature controlling device that can both lower and raise the internal temperature of the container in relation to the ambient air temperature, so that the proper storage temperature for perishable items is maintained. The TK unit contains a compressor that moves freon through an evaporator and a condenser to create the changes in air temperature. Transcript (Tr.) at 52. Heated or cooled air is forced into the internal compartment of the container by a fan.

The one factual issue that may affect the resolution of this matter does not appear to be disputed seriously by plaintiff. The issue is whether the container is used predominantly in the refrigeration mode. Plaintiff did not list a contention of fact to the contrary in its pretrial order. Plaintiff's chief witness offered a "guess" that the containers were most often used for refrigeration, Tr. at 130, and plaintiff's promotional materials describe the product as a "refrigerated container." Defendant's witness, Mr. Kenneth Southworth, was qualified to offer opinion testimony on the container industry and certain commercial refrigeration industries.[2] He testified that the product is accepted in the container industry as a refrigerated container or "reefer," and that it is primarily used for transport in the refrigeration mode. Written Testimony of Kenneth Southworth, Schedule G–2 to November 30, 1989 Pre-trial Order at 2, 5. If there is a dispute on this point, the evidence would seem to be exclusively in defendant's favor.

Thus, the only dispute remaining to be resolved is a legal one, that is, whether the temperature-controlled intermodal freight containers at issue are to be classified as "containers" under part 3 of schedule 6, Tariff Schedules of the United States (TSUS); whether they are to be classified under part 4 of schedule 6 as "refrigerating equipment;" or whether some other provision of the TSUS is applicable.[3]

1. *The Plain Language of the Statute*

The relevant tariff provisions appear to be:

Item 911.80—

Freight containers specially designed and equipped to facilitate the carriage of goods by one or more modes of transport without intermediate reloading, each having a gross mass rating of at least 40,000 pounds (provided for in 640.30, part 3A, schedule 6);[4]

Schedule 6, part 3, subpart A, headnote 1—

1. Plaintiff asserts that the TK unit is easily removable and is an accessory to the basic container. The testimony establishes that the container is designed to be used with a temperature control device and that the device is only removed for maintenance. Furthermore, the container was imported with the TK unit attached. The entire refrigerated container is the article of commerce at issue. *See* R. Sturm 2 *Customs Law and Administration* § 54.11 (3rd ed. 1989). Although the TK unit is of American manufacture, no special consideration was requested based on this fact at the time of importation. *See* item 807, Tariff Schedules of the United States. Thus, such manufacture is irrelevant and classification and appraisal should be based on the entire product. Plaintiff raised another appraisement issue regarding the depreciation schedule used by defendant, but plaintiff presented only a conclusory statement of a 5 year life expectancy to rebut the more detailed evidence submitted by defendant. Such evidence established that a 10 year depreciation schedule comported with industry approxima-

tions of value. The court therefore accepts Customs's depreciation schedule.

2. Refrigeration is defined as "[t]he cooling of a space or substance below the environmental temperature." 15 *McGraw–Hill* at 257. No witness was qualified properly as an expert in household refrigeration, an area which is probably irrelevant. There is also little meaningful testimony on the meaning of the word "refrigerator." None of the witnesses appeared comfortable with labelling the product at issue as a "refrigerator," but this also seems irrelevant. Customs's classification covers "refrigerators and refrigerating equipment;" the latter appears to be a much broader term than "refrigerator." *See also* definitions of "refrigerator," *infra*, at 1139–1140.

3. All provisions are as found in the 1983 TSUS, as supplemented.

4. Item 911.80 is a special duty exemption classification item.

... This subpart ... does not include —(i) containers with provision made for circulating heating or cooling fluids between the walls, or with mechanical or thermal equipment such as agitators, heating or cooling coils, or electrical elements (see parts 4 and 5 of this schedule);

Item 640.30 (from schedule 6, part 3)—

Drums, flasks, casks, cans, boxes, lift vans, and other containers ... all the foregoing, of base metal, chiefly used in the packing, transporting, or marketing of goods:

&ast; &ast; &ast; &ast; &ast; &ast;

Other;

Item 661.35 (from schedule 6, part 4)—

Refrigerators and refrigerating equipment, whether or not electric, and parts thereof;

&ast; &ast; &ast; &ast; &ast; &ast;

### a. *Refrigerating Equipment*

Defendant states that its claimed classification, item 661.35 is an *eo nomine* provision.[5] Plaintiff does not appear to dispute this, and the court would note a recent decision of this court involving a similarly worded TSUS item, wherein it was stated that "Drafting machines and drawing machines" is an *eo nomine* provision. *Apple Computer v. United States*, 14 CIT ——, Slip Op. 90–14 at 13–17, 1990 WL 13580 (February 13, 1990). If item 661.35 is an *eo nomine* provision, one might argue that the product at issue is *more than* a "refrigerator or refrigerating equipment," in that the product is sometimes used to keep perishable items at a temperature above that of the ambient temperature, rather than below it. The court also notes, however, *Webster's Third New International Dictionary* (*Webster's*) definition of "refrigerator [railroad] car": "a freight car constructed and used primarily as a refrigerator in transporting fresh meats, fruits, vegetables and usu. also adaptable by the installation of heating units for transporting commodities that must be protected from cold." *See id.* at 1910. The testimony of Mr. Southworth with regard to refrigerated containers makes similar reference to use of a heating mode. Thus, the transportation industry concept of refrigeration appears to allow for broad temperature control use. In any case, pure *eo nomine* concepts may not control.

Although item 661.35 may have *eo nomine* characteristics, as did the provision in *Apple Computer*, it also has some indicia of a use provision.[6] The most relevant part of the provision, "refrigerating equipment," could be said to cover equipment predominantly *used* for refrigeration. Furthermore, headnote 2 of part 4 of schedule 6, which contains item 661.35, indicates that "a multi-purpose machine is classifiable according to its principal purpose." Thus, even if the provision has *eo nomine* aspects the statute may have supplanted, to some degree, ordinary customs classification principles.

Whether item 661.35 is a use or an *eo nomine* one, the container aspects of the product remain important. Although plaintiff argues that the basic use of the product is as a shipping container, the presence of a container does not render the product "more than" "refrigerators and refrigerating equipment." *Webster's* defines "refrigerator" in part as "a cabinet or room for keeping food or other articles cool ..." *id.* at 1910. A refrigerator is also described as an "insulated, cooled compartment." 15 *McGraw–Hill* at 263. Thus, some kind of containment would seem to be essential to the refrigeration function.

The testimony and lexicographical sources indicate that the product at issue falls within the common meaning of the broad term "refrigerating equipment" under either an *eo nomine* or a use analysis. This also comports with industry under-

---

**5.** An *eo nomine* provision is one which describes a commodity by name, usually one well known to commerce. *United States v. Bruckmann*, 65 CCPA 90, 94 n. 8, 582 F.2d 622, 625 n. 8 (1978) (*citing* R. Sturm, *A Manual of Customs Law* 215 (1974)).

**6.** The status of a provision as a use provision is to be determined from the language of the provision, and the words "use" or "used" need not be contained therein. 2 R. Sturm, *Customs Law & Admin.* § 53.3 (3rd ed. 1989).

standing. *See, supra,* discussion at 3, 5–6. Furthermore, Customs's long-standing practice would appear to be in agreement. *See Summaries of Trade and Tariff Information,* Vol. 8, Schedule 6, T.C.Pub. 312 at 90 (1969) (*Summaries*). Based on all of these factors the court concludes that item 661.35, covering "refrigerating equipment," is an appropriate classification for the product at issue.[7]

### b. *Containers*

The wording of plaintiff's claimed classification, that is, "container" under item 640.30, would also fit the product well, and perhaps better than item 661.35, but for one controlling factor. Headnote 1 of the relevant TSUS part appears to eliminate item 640.30 as a possible classification. The product at issue is a "container with mechanical or thermal equipment ... or electrical elements ...," and thus is expressly excluded from coverage under item 640.30. *See* Headnote 1, part 3, schedule 6, TSUS (quoted *supra* at 4).[8]

Despite this seemingly plain language plaintiff asserts that "container" in headnote 1 does not mean "freight container." Plaintiff indicates this conclusion is warranted because "lift vans" are specifically mentioned in item 640.30, and lift vans have temperature control accessories. There is nothing in the record, however, which indicates that all lift vans are temperature controlled and *Webster's* at 1307 describes a "lift van" as simply "a large strong waterproof shipping case...." Thus, temperature control does not appear essential to the meaning of "lift van." Accordingly, the court finds no reason to read the word "container" in headnote 1 more narrowly than its ordinary common meaning.

United States Tariff Commission, *Tariff Classification Study,* Schedule 6 at 262 (1960) (Study) also sheds light on the competing TSUS items. The Study indicates that item 661.35 is derived from part of paragraph 353 of Schedule 3, Tariff Act of 1930. That paragraph provided, *inter alia,* for articles having as "an essential feature an electrical element or device, such as ... refrigerators." *See also Summaries,* Vol. 3, Schedule 3, Part 3 at 85 (1948). The Study at 178–79 also indicates that item 640.30 was derived from paragraphs 305, 328, 339, and 397 of the Tariff Act of 1930; none of these paragraphs appears to cover articles with electric elements. Thus, the Study supports the plain meaning of the headnote; that is, containers with electrical elements for temperature control are not covered by item 640.30.

### 2. *Legislative History*

Although not phrased in this manner, plaintiff's basic argument is that Congress intended to exempt all types of reusable containers of this size from duties, whether they are refrigerated or not, and, if the words of the statute do make the refrigerated containers at issue dutiable by excluding them from item 640.30, this was a drafting mistake.

At the court's request the parties have set forth at great length the legislative history of the container duty exemption reflected in special classification item 911.-80, TSUS. Such history reveals that it was clearly the intent of Congress to provide some relief from record keeping and other administrative tasks to both the container industry and Customs. The administrative burdens and the cost of deciding when certain reusable containers were diverted to domestic use (thus, becoming dutiable), as opposed to remaining in international commerce, were too great. *See* 19 U.S.C. § 1322(a) (1988) and 19 C.F.R. 10.41a (1989) (instruments of international traffic not subject to duties).[9]

---

**7.** The court makes no decision as to the classification of temperature controlled containers not *predominantly* used for refrigeration.

**8.** No relative specificity analysis is necessary because only one TSUS item applies. *See* TSUS General Headnote 10(c). The potentially conflicting item is eliminated by headnote 1.

**9.** The fact of diversion to domestic use was stipulated for purposes of this test case. Plaintiff's Opening Brief (post-trial) at 26, note 2 and Defendant's Post-trial Brief at 2, note 1.

The problem for plaintiff is that there is very little which indicates just how far Congress wanted to go in providing relief from tracking containers, particularly those as valuable as the temperature controlled containers at issue. Before coming to the conclusion that Congress did not mean what it apparently said, the court would need to find the legislative history very explicit as to intent. *See Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–45, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984); *Watt v. Alaska*, 451 U.S. 259, 266–67, 101 S.Ct. 1673, 1677–78, 68 L.Ed.2d 80 (1981).

The best that can be said of the legislative history, in plaintiff's behalf, is that one witness at legislative hearings appears to have spoken of an earlier version of the finally enacted legislation as if it were to cover refrigerated containers. *Leather Apparel and Miscellaneous Bills: Hearings before the Subcommittee on Trade of the Committee on Ways and Means, House of Representatives*, 96th Cong., 2d Sess. 97 (1984). (Note the statement of Mr. Armstrong of the U.S. Maritime Administration). Despite the parties' arguments, the court finds nothing else in the legislative history that sheds light on this matter. Neither the sponsoring Congressman nor a committee report ever described the predecessor bills, or the one finally enacted, as covering refrigerated containers.

That those supporting or opposing legislation make statements as to their interpretation of legislation appears a weak basis on which to conclude that the words of the statute do not mean what they say. Statements at hearings should not be imputed wholesale to the enacting Congress. *See*

*Allen v. State Bd. of Elections*, 393 U.S. 544, 568–69, 89 S.Ct. 817, 833, 22 L.Ed.2d 1 (1969); *United States v. Public Utilities Comm'n*, 345 U.S. 295, 319, 73 S.Ct. 706, 719, 97 L.Ed. 1020 (1953) (Jackson, J., concurring). It is quite possible that had the legislation been drafted to accomplish plaintiff's ultimate goal, successful opposition would have emerged.

In this case the legislative history is simply too tenuous and the headnote is simply too clear for the court to assume that a drafting error occurred. Without legislative history that clearly supports plaintiff's view of legislative intent, the court must presume that Congress knew what the law was and what would be necessary to change it. Thus, the plain language controls.[10]

Judgment shall be entered for defendant in accordance with this opinion.

## JUDGMENT

This case having been submitted for decision and the Court, after deliberation, having rendered a decision therein; now, in conformity with that decision,

IT IS HEREBY ORDERED: that judgment is entered for defendant upholding its classification and granting its appraisement counterclaim. Defendant shall collect such duties as are owing with interest as provided.

---

10. Plaintiff also argues that the new Harmonized Code provision for "containers" covers refrigerated containers. This may be so, but the Harmonized Code does not control the classification of these entries. Although the legislative history of the new code does reflect a general intent to adhere to past tariff treatment, it also admits of the possibility of some variation. *Omnibus Trade and Competitiveness Act of 1988, Implementation of Harmonized Tariff Schedule*, H.Conf.R. No. 576, 100th Cong., 2d Sess. 548, *reprinted in* 1988 U.S.CODE CONG. & ADMIN. NEWS 1581–83. In the face of plain statutory language, however, the intent of a later Congress is, for the most part, irrelevant.