AUTOMOBILE CLUB OF NEW YORK, INC. and AAA Clubs of New Jersey, Plaintiffs-Appellants,

v.

William M. COX, Administrator, Federal Highway Administration, Brock Adams, Secretary, United States Department of Transportation, and the Port Authority of New York and New Jersey, Defendants-Appellees.

No. 29, Docket 78–6054.

United States Court of Appeals, Second Circuit.

Argued Oct. 16, 1978.

Decided Jan. 12, 1979.

Anthony S. Genovese, New York City (Kissam, Halpin & Genovese, Richard J. Tufano and William J. Quirk, New York City, of counsel), for plaintiffs-appellants.

Richard J. Weisberg, (Asst. U. S. Atty., New York City, Robert B. Fiske, Jr., U. S. Atty. for the S. D. N. Y., Patrick H. Barth, Asst. U. S. Atty., New York City, of counsel), for defendants-appellees, William M. Cox and Brock Adams.

Joseph Lesser, New York City (Patrick J. Falvey, Gen. Counsel, The Port Authority of New York and New Jersey, New York, N. Y., Isobel E. Muirhead, Arthur P. Berg, Vigdor D. Bernstein, and Sholem Friedman, New York City, of counsel), for defendant-appellee, Port Authority.

Before FRIENDLY, TIMBERS and VAN GRAAFEILAND, Circuit Judges.

FRIENDLY, Circuit Judge:

The Automobile Club of New York, Inc. and AAA Clubs of New Jersey (the Auto Clubs) appeal from an order of the District Court for the Southern District of New York 444 F.Supp. 174 (1978), dismissing their complaints in an action to review a decision of the Federal Highway Administration,[1] which approved the 1975 action of the Port Authority of New York and New Jersey (PA) in increasing the tolls on its four interstate bridges[2] from $1 to $1.50 per round trip. The thrust of the Auto Clubs' objection was that, insofar as the Highway Administrator's approval rested on the proposition that the increased tolls were needed to provide a fair return, he erred in considering not only the four bridges but also the Holland and Lincoln Tunnels, PA's bus terminals at the Manhattan ends of the Lincoln Tunnel and the George Washington Bridge, and the Port Authority Trans-Hudson Railroad (PATH). Although we find the problem a great deal more difficult than did the district judge and are not in complete agreement with him, we nevertheless affirm on a qualified basis developed in the course of this opinion.

The parties agree that the four bridges were constructed under the provisions of the General Bridge Act of 1906, 33 U.S.C. §§ 491–98,[3] and that the applicable legal standard for fixing tolls is found in the last sentence of 33 U.S.C. § 494, as it then stood:

---

1. The reported opinion dismissed the complaint only against the Federal Highway Administrator and the Secretary of Transportation, 444 F.Supp. at 178. Subsequently, on the basis of a stipulation that the Port Authority had not used a rate base other than that approved by the Administrator, the court also dismissed the complaint against PA.

2. The George Washington Bridge spans the Hudson River from Fort Lee, N. J. to 178th St. in New York City. The Bayonne Bridge, the Goethals Bridge and the Outerbridge Crossing connect various points in New Jersey with Staten Island, N. Y.

3. This applies to all bridges over navigable waters, not merely to interstate bridges.

If tolls shall be charged for the transit over any bridge constructed under the provisions of said sections, of engines, cars, street cars, wagons, carriages, vehicles, animals, foot passengers, or other passengers, such tolls shall be reasonable and just, and the Secretary of the Army may, at any time, and from time to time, prescribe the reasonable rates of toll for such transit over such bridge, and the rates so prescribed shall be the legal rates and shall be the rates demanded and received for such transit.

The function originally granted to the Secretary of the Army was transferred in 1966 to the Secretary of Transportation, 49 U.S.C. § 1655(g)(6)(B), who has delegated it to the Federal Highway Administrator, 49 C.F.R. § 1.48(i)(1). The question here is how this septuagenarian statute is to be applied to the complex of different services owned and operated by the PA in the urban sprawl of southeastern New York and northeastern New Jersey. Before addressing the question directly it is necessary to outline the relevant history of the PA.

### I.

The PA was established in 1921 by legislation of New York and New Jersey, which Congress approved as an interstate compact by a joint resolution, 42 Stat. 174. Its principal purpose was to effectuate "a better co-ordination of the terminal, transportation and other facilities of commerce in, about and through the port of New York." N.Y. Unconsolidated Laws, § 6401.[4] The compact created an extensive Port of New York District, whose boundaries might be changed from time to time by joint legislative action, § 6403.[5] The PA was to have the powers enumerated in the compact and "such other and additional powers as shall be conferred upon it by the legislature of either state concurred in by the legislature of the other, or by act or acts of congress, as hereinafter provided." § 6404. The PA

was empowered "to purchase, construct, lease and/or operate any terminal or transportation facility" within the district, § 6407. Transportation facility was defined to include, *inter alia*, "railroads, steam or electric . . . tunnels, bridges . . and every kind of transportation facility now in use or hereafter designed for use for the transportation or carriage of persons or property." § 6423. In contrast, while the definition of "terminal facility" was also broad, there was no reference to passenger stations and the catch-all clause was limited to freight, § 6423. The original compact was shortly followed by an agreement on a comprehensive plan for the development of the Port of New York, Unconsolidated Laws §§ 6451–68, also approved by Congress, 42 Stat. 822 (1922).

On March 2, 1925, Congress consented to the construction of the four bridges, 43 Stat. 1094, subject to the provisions of the 1906 Bridge Act. The Goethals and Outerbridge Crossing bridges were opened for traffic in 1928, the Bayonne and George Washington bridges in 1931. Before any of these dates the Holland Tunnel, constructed under an earlier 1919 compact, 41 Stat. 158, had been opened on November 13, 1927.

In 1931 the two states adopted identical legislation for "bridge and tunnel unification." Unconsolidated Laws, §§ 6501–25. The states agreed "that the vehicular traffic moving across the interstate waters within the port of New York district . . constitutes a general movement of traffic which follows the most accessible and practicable routes, and that the users of each bridge or tunnel over or under the said waters benefit by the existence of every other bridge or tunnel since all such bridges and tunnels as a group facilitate the movement of such traffic and relieve congestion at each of the several bridges and tunnels." Accordingly the states agreed "that the construction, maintenance, operation and

---

4. In all cases New Jersey adopted identical provisions. We shall refer only to the New York legislation.

5. The district is quite large. It reaches as far north as 2.1 miles northwest of Piermont, N. Y., as far west as 1 mile west of New Brunswick, N. J., and as far east as 5 miles east of Jamaica, L. I. The southern tip is in the Atlantic Ocean.

control of all such bridges and tunnels, heretofore or hereafter authorized by the two said states, shall be unified" under the PA "to the end that the tolls and other revenues therefrom shall be applied so far as practicable to the costs of the construction, maintenance and operation of said bridges and tunnels as a group and economies in operation effected, it being the policy of the two said states that such bridges and tunnels shall as a group be in all respects self-sustaining." Unconsolidated Laws § 6501. Control of the Holland Tunnel was vested in the PA and the earlier compact concerning it was abrogated; a new Midtown Hudson tunnel (later christened the Lincoln Tunnel) was authorized. Unconsolidated Laws §§ 6502, 6510. In 1946 the PA was authorized to construct a motor bus terminal, Unconsolidated Laws, §§ 6701–06, which was located on W. 40th Street and 8th Avenue near the Manhattan end of the Lincoln tunnel. Ten years later it was authorized to construct another bus facility in Washington Heights, N. Y. "as an addition and improvement to . . . the George Washington bridge." Unconsolidated Laws § 6505.

The addition of PATH was more controversial; part of the story has been recently recounted in *United States Trust Co. v. New Jersey*, 431 U.S. 1, 9–12, 97 S.Ct. 1505, 52 L.Ed.2d 92 (1977). The Hudson & Manhattan Railroad had operated an interstate electric commuter system between points in New Jersey, including Newark, Hoboken and Jersey City, and points in downtown and midtown New York City through two downtown and two midtown tubes, and a connecting subway system in New York City, and also owned the Hudson Terminal Buildings in downtown New York. It had become insolvent, in part because of "loss of passengers to publicly financed vehicular crossings of the Hudson River by bridge and tunnel." *Spitzer v. Stichman*, 278 F.2d 402, 406 (2 Cir. 1960). The solution was to transfer its properties to PA which would modernize the rail operations and would replace the outmoded office buildings with the World Trade Center. The legislatures responded in 1961 with the necessary legis-

lation, Unconsolidated Laws, §§ 6601–18, which was characterized as supplementary to the 1921 compact. However, in contrast to the 1931 bridge and tunnel unification legislation, there was no recitation that the users of PATH benefited from the bridges and tunnels or *vice versa*, and no direction for a "single unified operation" such as had been made with respect to the bridges and tunnels in Unconsolidated Laws §§ 6501 and 6504.

## II.

On April 10, 1975, PA adopted new bridge tolls effective May 5, 1975; this was the first increase in more than four decades. PA raised the standard automobile round trip rate on its four bridges from $1 to $1.50, and the commuter round trip rate from 50 cents to $1, and increased the truck rate by 50%. Bus tolls were not increased and PA instituted a carpool discount whereby vehicles carrying three or more persons during weekdays would be charged only $.50. Tunnel tolls were similarly altered. In notifying the Secretary of Transportation of the new tariffs, the Chairman of PA advised:

Our plan is to devote the additional revenues derived from these toll increases to four presently-authorized but new Port Authority mass transit projects:

The expansion of the midtown Port Authority Bus Terminal;

The extension of PATH to Plainfield via Newark International Airport;

Rail access between Kennedy International Airport and Penn Station, Manhattan using Long Island Railroad tracks and high-speed MTA cars; and

Direct rail service from New Jersey into Penn Station, Manhattan for certain trains on the Erie Lackawanna Railroad.

The first of these four projects has been nearly completed, the second and third have been abandoned at least for the time being, and the fourth is still under study.

The Auto Clubs and others promptly protested to the Administrator that the new

bridge toll rates were not reasonable and just within the meaning of the General Bridge Act. After what seem to have been unduly protracted preliminary proceedings, the Administrator, on April 8, 1976, ordered an evidentiary hearing over which an ALJ was to preside. This occurred on November 3–9, 1976.

On May 9, 1977, the ALJ issued a recommended decision and order that PA restore the charges to their previous level. He thought it to be "clear that the framers of the term [reasonable and just] had in mind the needs of the local population" and that their purpose was "to protect the local users of toll bridges." See 40 Cong.Rec. 1717, 59th Cong., 1st Sess. (1906). Believing that a 1952 statute relating to the Delaware River Port Authority, 66 Stat. 747–52, greatly relied upon by PA in support of a combined approach, which we will discuss in Part IV below, worked against PA's contention rather than for it, he concluded that "facilities other than the four bridges involved in this proceeding may not be considered for the purpose of forming the rate base since such has not been authorized by Congress." The ALJ also decided that the four bridges could properly be grouped and that a rate of return on net investment in excess of 6.5% per annum would be excessive.[6] He concluded that the increased charges should be found unreasonable and unjust, that the previous charges should be restored, and that PA should make a comprehensive feasibility study and recommendation (including higher peak hour charges) and submit this to the Administrator within a year.

The Administrator, in disagreement with the ALJ, upheld the increase. He first found that bridge users do not "have any justifiable expectation that, in an era of escalating costs, tolls will remain the same",

and that the increased toll compared "favorably to those applicable to river crossings elsewhere in the vicinity", being "identical to that charged by the Triborough Bridge and Tunnel Authority on the Triborough, Bronx-Whitestone, and Throgs Neck bridges, as well as for the Queens Midtown and Brooklyn-Battery tunnels." Although regarding these findings as having established the "fairness of the tolls to the users", the Administrator went on to "consider the relation of the revenues produced by the tolls to the needs of the Port Authority." He thought that "if net operating revenues produced by the tolls exceed an appropriate return on the investment used in the rate base, the tolls cannot in any circumstance be found by the Administrator to be reasonable and just". Relying on the direction to PA under 1931 legislation, N.Y.Unconsolidated Laws § 7002, to pool all surplus revenues from facilities acquired by the sale of bonds to establish a general reserve fund in an amount equal to 10% of their par value,[7] the Delaware River Port Authority analogy, and "regulatory law from other fields", the Administrator determined that the rates should be fixed on the basis of the combined operation of the four bridges, the two tunnels, the two bus terminals, and PATH, since "[t]he record shows that if any one facility were not in existence, the use of others would increase correspondingly, as, significantly, would the congestion of these other facilities."[8] On the basis indicated, the increased tolls would produce only a 4% return on the unamortized investment in use in 1976 and 1977 and less thereafter. After the Administrator overruled exceptions and denied petitions for reconsideration, although making some minor corrections in his opinion, plaintiffs brought this action in which they sought, *inter alia*, a declaration that the

---

**6.** In 1974, under the previous tolls, the four bridges had earned 16.2% on invested capital; it was estimated that they would earn 27.3% in 1976 under the increased tolls.

**7.** We find this portion of the Administrator's reasoning wholly unpersuasive and shall not discuss it further.

**8.** The Administrator excluded PA's motor terminal facilities "because of the lack of evidence connecting these with across-harbor, as distinct from other movements." For the same reason he excluded the World Trade Center, the airports "and other facilities not involved in transwater crossings."

decision approving the increase should be set aside. As stated above, the district court dismissed the complaint, 444 F.Supp. 174, and plaintiffs have appealed.

### III.

■ Although neither the parties nor the district court discussed the standard of judicial review, we deem it desirable to begin by doing so. In disagreement with the district court in *Delaware River Port Authority v. Tiemann*, 403 F.Supp. 1117, 1126–27 (D.N.J.1975), vacated and remanded, 531 F.2d 699 (3 Cir. 1976), on remand 421 F.Supp. 142 (D.N.J.1976), we think the proper standard is that provided by 5 U.S.C. § 706(2)(A), to wit, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law", rather than the possibly stricter standard of § 706(2)(E), "unsupported by substantial evidence". The substantial evidence standard is mandated only for cases "subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing *provided by statute*" (emphasis supplied). The approval of rates for the future constitutes rulemaking, not adjudication, 5 U.S.C. § 551(4), (5), (6), (7), and is not required by §§ 553 or 554 to be conducted pursuant to §§ 556 and 557. Since the General Bridge Act of 1906, *supra*, does not provide for a hearing, it is immaterial that, pursuant to regulations promulgated by the Administrator, 49 C.F.R. §§ 310.10–310.12, one was had in this case.

### IV.

■ Since both the Administrator and the district court placed great weight on the 1952 Congressional legislation relating to the Delaware River Port Authority (DRPA), we shall now deal with this. In 1946, Congress adopted a new General Bridge Act, 33 U.S.C. §§ 525–33, to govern the construction of bridges approved after August 2, 1946. One section, 33 U.S.C. § 526, vested in the Secretary of the Army, later the Secretary of Transportation, rate-making authority in terms quite similar to the General Bridge Act of 1906. However, another section, 33 U.S.C. § 529, provided:

> If tolls are charged for the use of an interstate bridge constructed or taken over or acquired by a State or States or by any municipality or other political subdivision or public agency thereof, under the provisions of [sections 525 to 533 of this title], the rates of toll shall be so adjusted as to provide a fund sufficient to pay for the reasonable cost of maintaining, repairing, and operating the bridge and its approaches under economical management, and to provide a sinking fund sufficient to amortize the amount paid therefor, including reasonable interest and financing cost, as soon as possible under reasonable charges, but within a period of not to exceed thirty years from the date of completing or acquiring the same. After a sinking fund sufficient for such amortization shall have been so provided, such bridge shall thereafter be maintained and operated free of tolls.

In 1952 Congress granted its consent to a supplemental compact between the states of New Jersey and Pennsylvania which created DRPA, 66 Stat. 747. Section 3 of this contained the provisions quoted in the margin.[9]

---

**9.** Notwithstanding any limitation on the collection of tolls as prescribed by Section 506 [33 U.S.C. § 529] of the General Bridge Act of 1946, as amended, or as prescribed by any Act heretofore enacted by the Congress authorizing or consenting to the construction or acquisition of any bridge constructed or acquired by the commission, the commission is hereby authorized to fix, charge, and collect tolls or other charges for the use of any bridge or tunnel heretofore or hereafter established, controlled, constructed, or acquired by the commission, and to combine any two or more of such bridges or tunnels, or combine any one or more of such bridges or tunnels, with any railroad, rapid-transit system, or other properties or facilities for transportation, terminal or port improvement purposes (each such bridge, tunnel, railroad, system, or other property or facility being hereinafter referred to as 'facility') heretofore or hereafter established, controlled, constructed, or acquired by the commission, and combine the tolls or revenues therefrom, and to fix, charge, and collect tolls or other charges for the use of such facilities so combined, and to use or pledge any such tolls or other charges

The 1952 statute, standing alone, might seem to work against PA rather than for it, as the ALJ thought. Congress deemed it necessary to make a specific grant to DRPA of the power to fix bridge tolls on the basis of the combined operation of bridges, tunnels, railroads, etc., but has made no such grant to PA. Furthermore the collection of any bridge tolls by DRPA was to end "fifty years from the date of the opening to traffic . . . of the bridge latest constructed or acquired . . . after the effective date of this Act . . .", a limitation to which PA is not bound. Against this it can be said with force that such an exemption was needed for the DRPA but not for PA because of § 506 of the 1946 Act, 33 U.S.C. § 529, which has no counterpart in the 1906 Act. Still, this leaves the matter just as it would have been if the 1952 statute had not been enacted, i. e., with no fair inference either supporting or refuting PA's contentions and the Administrator's decision.

The basis asserted for drawing a more favorable inference from the 1952 legislation is a passage from the House Report, H.R.Rep.No.2293, 82d Cong. 2d Sess. at 3 (1952), thereon, which states:

> Having consented to a similar development of the port of New York, the only other port lying within the territory or jurisdiction of two States, the Congress has ample precedent for approving this legislation which provides the only practicable means for developing the Delaware River Port district as a vitally necessary center of commerce.

This is sought to be supplemented by an extract from a report of the Department of Commerce which was included in the same House Report at pp. 9–10, and also in the Senate Report on a counterpart bill, No. 2089, 82d Cong. 2d Sess. at 8–9. We quote this in the margin.[10]

---

for purposes of financing, acquiring, constructing, operating or maintaining any facility or facilities, all to the extent provided by and in accordance with the provisions of the aforesaid compact or agreement as amended and supplemented, as consented to by the Congress, and the laws of the State of New Jersey and Commonwealth of Pennsylvania with respect thereto or to said commission: *Provided*, That as a specific exemption from the provisions of section 506 of the General Bridge Act of 1946, as amended, the collection of tolls for the use of any bridge hereafter constructed or acquired by the commission, in excess of amounts reasonably required for the operation and maintenance thereof under economical management, shall cease at the expiration of fifty years from the date of the opening to traffic by the commission of the bridge latest constructed or acquired by said commission after the effective date of this Act, and the rate of such tolls shall be subject to the provisions of section 503 [33 U.S.C. § 526] of the General Bridge Act of 1946, as amended.

10. The purpose, functions, and scope of authority of the proposed Delaware River Port Authority would be similar to those of the existing Port of New York Authority in that it would be empowered to establish, operate, and finance on a unified and integrated basis multiple types of facilities to promote the development of a densely populated and industrialized metropolitan and port area as a center of foreign and domestic commerce. Because of the great cost involved in the construction, maintenance, and operation of

facilities for the development of such an area it has been urged that all such facilities, including highway bridges and highway tunnels, serve one common purpose and are so interrelated that they should be combined for financing purposes, with tolls or other charges to be collected on all facilities so combined without any limitation as to time.

The financial and toll aspects of this problem were the subject of extensive correspondence during the mid-thirties between the Bureau of Public Roads, which then was in the Department of Agriculture, and the Port of New York Authority, the only such authority then in existence. At about that time various legislative proposals were under consideration for a general bridge act to eliminate the necessity of enacting a special bill for each individual bridge, which practice had become burdensome to the President and to the Congress. It was in this connection that the Bureau of Public Roads received from the Port of New York Authority a letter of May 16, 1938, and it is believed desirable to quote the following pertinent excerpts from that letter:

" * * * Permission to include a bridge in the Port Authority group operation would be valueless, unless tolls can be adjusted from the standpoint of the group as a whole and not from the standpoint of the particular bridge.

The port authority financing of bridges, tunnels, and related terminal projects rests upon the proposition that the present facili-

We think the Administrator overstated the importance of this. While the quoted sentence can be taken as the Committee's answer to questions of the Bureau of Public Roads, mentioned in the House Report at 2, concerning "the desirability of compelling interstate bridge traffic to support non-bridge facilities", we believe most of those Congressmen who read the report would have had the impression, see *United States v. Public Utilities Comm'n,* 345 U.S. 295, 319, 73 S.Ct. 706, 97 L.Ed. 1020 (1953) (concurring opinion of Mr. Justice Jackson), that the Committee considered these questions to have been already answered by the statements in the report that only 5.04% of the existing bridge traffic "continued without terminating their trips or making a major stop in the port district" and that local users appearing before the Committee had urged the pooling of revenues, and that the quoted passage dealt rather with the more general issue of the need for a bi-state authority to handle a bi-state problem. Thus few Congressmen would have believed they were placing the seal of legislative approval on the application to PA of a similar philosophy of rate making simply by approving the DRPA compact. The Department of Commerce report annexed to the two reports also says considerably less than defendants appear to argue. The statement that DRPA should be empowered to establish, operate and finance multiple types of facilities on a unified and integrated basis similar to PA could refer simply to PA's practice of pooling all surplus revenues and not to the proper rate base for setting bridge tolls. In saying that "tolls or other charges" should "be collected on all facilities so combined without any limitation as to time", the Department of Commerce was not necessarily stating that bridge tolls could be kept high to make up for deficits on other facilities. Indeed, even the 1938 letter from PA incorporated in the report can hardly be read as suggesting that surplus revenue from bridge tolls may be used to make up railway deficits, which, as we will see, is the true issue here; what PA was asserting was the much more modest proposal that tolls should not have to be related to the cost of a particular bridge. To assert, as PA does, that the insertion of this 1938 letter in a 1952 Department of Commerce Report which was annexed to House and Senate reports on legislation dealing with another port authority shows that Congress was instructing the Administrator to fix PA bridge tolls "from the standpoint of the group as a whole"—including in the group an entity, PATH, that was not to enter it for another decade—is more imaginative than convincing. We are inevitably reminded of the observation of Mr. Justice Jackson that a court should reach its results "by analysis of the statute instead of by psychoanalysis of Congress," and of Mr. Justice Frankfurter that the court should not "extrapolate meaning from surmises and speculation . . ." *United States v. Public Utilities Comm'n, supra,* 345 U.S. at 319, 321, 73 S.Ct. at 719, 720 (1953) (concurring opinions). If the PA wished it to be clear that its bridge tolls

---

ties and facilities which may be needed in the future all serve a common pool of traffic and as a group depend upon this pool for their economic justification. No single existing or future interstate bridge in this district stands wholly on its own either from a financing or a toll standpoint. Therefore it is essential that no rigid formula be embodied in the act which tends to freeze the tolls on any new bridge so that it cannot be incorporated into the group financing and operation.

\* \* \* \* \* \*

"Obviously the adjustment of tolls on bridges included in the port authority group operation is a matter which is extraordinarily difficult to reduce to a formula which can be embodied in a congressional act, and we be-lieve that the soundest policy is to exempt this situation from any such formula and leave the reasonableness to the determination of the Secretary of War (or whatever Federal officer may be designated)."

\* \* \* \* \* \*

The Port of New York Authority was created in 1921 and was the only agency of its kind in existence for about 30 years. In view of this fact and the special circumstances involved no objection to the plan of toll financing by that authority was interposed during that time by the Bureau of Public Roads, either in connection with the administration of its Federal-aid road activities or otherwise.

should be fixed so as to provide a fair return for "the group" as a whole (including an interstate railway) and Congress was as approving as the PA now asserts, there was—and still is—a simple method for achieving this. That course not having been followed, the issue remains one for determination by the Highway Administrator under principles of law applicable to the General Bridge Act and, in the absence of these, to rate making in general.

## V.

We begin by noting that the problem with which we are here faced could have been eliminated or at least greatly reduced in scope if the Secretary of Transportation had complied with Congress' direction in § 133(b) of the Federal-Aid Highway Act of 1973, 87 Stat. 250, 267 that he "shall promulgate regulations establishing guidelines governing any increase in tolls for use of any bridge constructed pursuant to either the General Bridge Act of 1906 or the General Bridge Act of 1946." [11] Such guidelines might have ruled out or wholly or partially sanctioned what the Administrator did here; in the latter event we would have had the benefit of the record in an extensive rulemaking proceeding.[12]

The judicial precedents under federal bridge legislation can be neatly packaged. Setting aside the DRPA litigation cited above, which is not directly relevant because it arose under the General Bridge Act of 1946 as modified by § 3 of the Act of July 17, 1952, the relevant cases under the 1906 Act are precisely two. *Clarksburg-Columbus Short Route Bridge Co. v. Woodring,* 67 App.D.C. 44, 89 F.2d 788, remanded for dismissal as moot, 302 U.S. 658, 58 S.Ct. 365, 82 L.Ed. 509 (1937), disapproved the

Secretary of the Army's lowering a toll solely because of considerations of reasonable return on investment. The court held that the owner of a competing bridge, who would be ruined by having to lower his tolls correspondingly, had a right to be heard on the issue, and that competitive factors must be considered, as they are in ICC ratemaking. The importance of this is the recognition that, under appropriate circumstances, a toll producing more than a fair rate of return may be just and reasonable.

The other case is *City of Burlington v. Turner,* 336 F.Supp. 594 (S.D.Iowa 1972), modified and affirmed, 471 F.2d 120 (8 Cir. 1973). The City had long charged tolls on the MacArthur Bridge over the Mississippi, originally privately owned. These tolls produced a significant surplus over bridge expenses and debt service, which was used to finance unrelated municipal activities. Severe protests were triggered when the City abolished a free return receipt, avowedly to produce an additional sum to finance salary raises for policemen and firemen. Rejecting the reasoning of *Clarksburg-Columbus* as "dubious" and "dicta", the Administrator not only disapproved the increase but rendered a far-reaching opinion to the effect that bridge tolls must be limited to bridge costs including provision for debt repayment but without profit, substantially the standard under the 1946 General Bridge Act, 33 U.S.C. § 529. The court reversed the Administrator, holding the standards set in the 1906 and 1946 General Bridge Acts to be distinct and finding *Clarksburg-Columbus* and the ICC cases to be useful precedent. It said that "Congress intended the term [reasonable and just] to have a certain flexibility so that it might, in the

---

11. The Secretary did comply with the direction of § 133(a) that he undertake a study of Federal statutes and regulations governing toll bridges over navigable waters of the United States "for the purpose of determining what action can and should be taken to assure just and reasonable tolls nationwide" and to submit a report of the findings of such study and recommendations for legislation by July 1, 1974. The transmittal letter accompanying the report stated

that proposed legislation would be submitted in the near future. Apparently none has been.

12. The public input in such rulemaking would doubtless be much more extensive than in these proceedings where the only parties were the PA, the Auto Clubs, Citizens for Clean Air, Inc., the Environmental Defense Fund, and Public Counsel.

discretion of the Administrator, be tailored to varying multi-factoral circumstances." *id.* at 604, many of which were noted at 607 n. 46. The court of appeals modified the district court's decision, which had simply enjoined enforcement of the Administrator's orders, so as to provide for a remand to the Administrator with a direction that his definition of "reasonable and just" must include a reasonable return on invested capital.[13]

Before further discussing the law, it will be well to show in more detail what the real dispute here is about. The following figures, which we have extracted from plaintiffs' exhibit 5–b, consisting of material furnished by PA, show the estimated results for 1976 with the toll increase in effect:

| Facility | Unamortized Investment in Use * (Excluding assets acquired with government contributions) | Gross Operating Revenues | Operating Expenses | Net Operating Revenues | Depr. | Income from Operations | Rate of Return on Unamortized Investment in Use * |
|---|---|---|---|---|---|---|---|
| | | | | In Millions of Dollars | | | |
| *Bridges* | | | | | | | |
| George Washington | 141.7 | 60.5 | 22.5 | 38.0 | 2.6 | 35.4 | 24.98 |
| Bayonne | 12.3 | 2.9 | 2.4 | 0.5 | 0.2 | 0.3 | 2.43 |
| Goethals | 17.9 | 15.5 | 5.7 | 9.8 | 0.5 | 9.3 | 51.95 |
| Outerbridge | 21.1 | 5.2 | 2.7 | 2.5 | 0.4 | 2.1 | 9.95 |
| All Bridges | 193.0 | 84.1 | 33.3 | 50.8 | 3.7 | 47.1 | 24.40 |
| *Tunnels* | | | | | | | |
| Holland | 39.5 | 17.1 | 14.2 | 2.9 | 1.0 | 1.9 | 4.81 |
| Lincoln | 136.7 | 26.5 | 16.4 | 10.1 | 2.6 | 7.5 | 5.48 |
| Two Tunnels | 176.2 | 43.6 | 30.6 | 13.0 | 3.6 | 9.4 | 5.33 |
| Bus Terminals | 32.4 | 15.0 | 13.2 | 1.8 | 0.8 | 1.0 | 3.08 |
| Sub-total | 401.6 | 142.7 | 77.1 | 65.6 | 8.1 | 7.5 | 14.32 |
| PATH | 175.7 | 14.0 | 43.7 | −29.7 | 4.4 | −34.1 | −19.40 |
| Total | 577.3 | 156.7 | 120.8 | 35.9 | 12.5 | 23.4 | 4.05 |

* In using this figure rather than total unamortized investment, we do not mean to express a judgment which of the two or, indeed, whether either is the appropriate base for the calculation of a fair return.

Quite evidently the serious problem is the inclusion of PATH. It stands alone among the operations in running at a deficit, a staggering one of over three dollars in operating expenses for each dollar of revenue.[14]

The concept of a fair return on an appropriate base is most often encountered in utility rate making when a utility is protesting a decrease or a refusal to grant an increase. Even in such cases the concept no longer possesses the rigidity that it once did. As was said in *F. P. C. v. Hope Natural Gas Co.*, 320 U.S. 591, 602, 64 S.Ct. 281, 288, 88 L.Ed. 333 (1944):

It is not theory but the impact of the rate order which counts. If the total effect of the rate order cannot be said to be unjust and unreasonable, judicial inquiry under the [Federal Power] Act is at an end. The fact that the method employed to reach that result may contain infirmities is not then important.

As a result of the remand the tolls were reduced, see Secretary of Transportation, A Study of Federal Statutes and Regulations Governing Toll Bridges 51–53 (1974).

**13.** The court added, 471 F.2d at 123:

The method Burlington used in setting tolls was based primarily on its financial needs, unrelated to the bridge, and is no more reasonable or just than the determination made by the Administrator pursuant to his order of April 30, 1971. The added factor of reasonable return on invested capital should result in tolls less than those set by Burlington, but may result in tolls greater than those prescribed by the Administrator.

**14.** The forecasts for the future were no better. The PATH figures for 1979 were: $15.5 million in operating expenses, a net operating deficit of $36.5 million, $5.3 million of depreciation, a deficit of $41.8 million in income from operations and a negative return of 23.24% on unamortized investment in use.

When the attack is by users, the ratemaker may, if he rationally chooses, give the concept a still smaller role. He may be required, as in *Clarksburg-Columbus, supra,* to consider whether the user may not be required to pay more than a fair return on one facility in order to maintain in business another furnishing a similar competing service. The court there quoted with approval, 67 App.D.C. at 49, 89 F.2d at 793, an early statement of the Interstate Commerce Commission in *Commercial Club of Salt Lake v. Atchison, T. & S. F. Ry. Co.,* 19 I.C.C. 218, 222 (1910):

> In determining a freight rate which must of necessity be charged by competing lines, [the Commission] would not look exclusively to that line which could handle the business the cheapest or which was the strongest financially, but would consider as well the weaker rival.

The same principle was affirmed in the Supreme Court's decision sustaining the validity of the "recapture clause" in Transportation Act, 1920, *Dayton-Goose Creek Ry. v. United States,* 263 U.S. 456, 480, 44 S.Ct. 169, 172, 68 L.Ed. 388 (1924), where Chief Justice Taft said:

> Rates which as a body enable all the railroads necessary to do the business of a rate territory or section, to enjoy not more than a fair net operating income on the aggregate value of their properties therein economically and efficiently operated, are reasonable from the standpoint of the individual shipper in that section. He with every other shipper similarly situated in the same section is vitally interested in having a system which can do all the business offered. If there is congestion, he suffers with the rest. He may, therefore, properly be required in the rates he pays to share with all other shippers of the same section the burden of maintaining an adequate railway capacity to do their business.

This same principle must apply *a fortiori* to charges for similar service on different facilities that are commonly owned.

It is possible, although we do not so decide, that the Administrator could have rested on his findings that in times of high inflation a 50% increase following 40 years of unchanged tolls was reasonable almost as a matter of law and that the increased tolls on the PA bridges were identical with those on similar facilities in the New York area. However, as shown in the remarks quoted above, 663, the Administrator did not consider it proper to do this. Under *SEC v. Chenery Corporation,* 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1943), we must therefore examine whether it was arbitrary or capricious for him to decide that all the facilities which he included "act to relieve congestion that would otherwise overburden the bridges" and that consequently "their investment should be considered along with that in the bridges themselves. . . ."

We have no difficulty in sustaining the Administrator's decision to combine the operations of the George Washington Bridge with those of the Holland and Lincoln tunnels. All three facilities serve the same purpose—providing vehicular access between New Jersey and Manhattan. Users of one facility are not entitled to a preference over users of another because the first was constructed at the lower costs of earlier days or because the investment has been reduced by depreciation. If all three facilities were bridges, presumably no one would seriously contend that they must be treated separately; we see no reason for a different view because two of them pass under rather than over the Hudson River. Moreover, if tolls were raised for the tunnels but not for the George Washington Bridge, there would be some diversion of traffic from the former to the latter, although it is easy to exaggerate the extent to which a 50 cent difference in round trip toll would cause such diversion in an era of high fuel prices.

These same considerations justify considering the three New Jersey-Staten Island bridges together despite the disparity in financial results which the table reveals.[15] The case for consolidating these

---

**15.** The forecasts reflect significant improvement in net operating revenues for the Outer-bridge Crossing but not for the Bayonne Bridge.

crossings with the Hudson crossings is much less cogent. The only common transportation element seems to be that the Staten Island crossings in conjunction with the Verrazano Narrows Bridge afford an alternative means of access between New Jersey and Brooklyn and other parts of Long Island for vehicles that would otherwise have used the Holland (or perhaps even the Lincoln) Tunnel and New York City bridges or tunnels between Manhattan and Long Island. In any event the Auto Clubs do not here oppose treating all four bridges together and if, as we hold, it was permissible to treat the tunnels and the George Washington Bridge together, the Clubs are on weak ground in opposing the combination of all six. Indeed, given their locations, the tunnels, especially the Holland Tunnel, are more closely related to the three Staten Island crossings than is the George Washington Bridge.

█ In addition to this functional relationship, great weight can be given, so far as the bridges and tunnels are concerned, to the 1931 bridge and tunnel unification legislation passed by New York and New Jersey, which we have quoted above. According to studies conducted by PA in 1972 and 1973, more than 93% of the bridge and tunnel

crossings were made by residents of New York and New Jersey. While the joint judgment of the two states that all PA bridges and tunnels should be considered as a group is not binding on the Federal Government, it is entitled to substantial deference.

█ With slightly less conviction we think the Administrator was justified in including the bus terminals. To the extent that the W. 40th Street terminal promotes use of the tunnels, it reduces congestion on the George Washington Bridge; to the extent that the bus terminals induce passengers to use buses rather than private cars, they reduce congestion both on the Bridge and in the tunnels.[16]

█ The serious question, as noted above, is the inclusion of PATH. As shown by the foregoing table, if PATH were excluded, the projected 1976 rate of return would be 14.32% as against the 6.50% recommended by the ALJ and approved by the Administrator as a fair return and the range of 7–10% asserted by PA.

We reproduce in the margin what the Administrator gave as reasons for including PATH.[17] Two of these must be dismissed.

---

**16.** The foregoing text is subject to two *caveats*. One is that we do not understand why the bus terminals should operate at such low rates of return on unamortized investment in use. These start with an estimated return of only 3.08% in 1976 and then rise somewhat in 1977 and 1978, but thereafter decline to −2.86% in 1979, −16.18% in 1980 and, apparently as a result of the completion of the addition to the W. 40th St. terminal, −3.42% in 1981. We have been directed to nothing in the record that would show why these commercial terminals should not be self-sustaining. The other is that some portion of these facilities apparently is devoted to bus transportation not crossing between New York and New Jersey. Whether bridge users might be entitled to a segregation of revenues, expenses and investment excluding traffic not using the trans-Hudson crossings and, if so, on what basis, might be an appropriate subject for consideration. However, so far as we can determine, neither of these points was raised before the Administrator.

**17.** "PATH and the Lincoln and Holland tunnels all have terminals in the Manhattan cen-

tral business district and all provide nearly interchangeable transportation options for persons residing in New Jersey and working in the central business district. Thus, discontinuance of any facility would significantly increase use and congestion of any other.

In addition, the relationship between PATH and the Staten Island bridges is sufficient to justify including them within a single rate base (Tr. 11/4 at 111)."

"The avoidance of congestion is of unquestionable advantage for bridge users. Congestion not only produces lost time and increases aggravation but contributes to the degradation of the environment of the congested facility by increased noise and engine emissions. Although it is virtually impossible to measure these costs in dollars, avoidance of them has an economic benefit to the user which should be charged to him. Because this economic benefit is as equally unquantifiable as the penalties of the costs avoided, a proxy for its value can be substituted. This proxy consists of the cost of providing other transportation facilities that divert traffic that would otherwise use and congest the bridges. The Administrator therefore con-

The reference cited for the interdependence of PATH and the Staten Island bridges proved the opposite, as the Administrator conceded in his opinion on the exceptions and petitions for reconsideration, and the new references cited by him simply showed the rather minor degree of relationship between the Staten Island bridges and the tunnels which we have mentioned. The first three sentences of the third extract are largely circular; we find more significance in the point, mentioned above, that the 1961 legislation with respect to the acquisition of the Hudson & Manhattan Railroad did not contain provisions with respect to unification similar to the 1931 bridge and tunnel legislation.[18] What is left is that if

PATH did not exist, the trans-Hudson tunnels and, to a lesser degree, the George Washington Bridge, would become overcrowded.

PA's Assistant Executive Director submitted the following figures concerning the number of people traveling eastbound across the Hudson between 7 and 10 A.M.

| Port Authority Vehicular Crossings: | Number of People |
|---|---|
| Auto | 63,400 |
| Bus | 64,600 |
| Port Authority Trans-Hudson Railroad | 46,800 |
| Pennsylvania Railroad Division of Conrail | 13,500 |
| Total | 188,300 [19] |

cludes that, since each of the facilities does contribute towards avoiding congestion on the bridges, inclusion of the capital invested in them in the rate base for the tolls is a reasonable proxy cost for the benefit conferred upon the bridge users."

"Another independent reason exists for including the investment of all these facilities in a single rate base. This is because these facilities were planned and have been operated by the Port Authority as an integrated, interdependent transportation system used to facilitate cross-water movements (PA–7, passim). The Administrator must pay some deference to the Port Authority's fiscal policy of pooling revenues and costs in all these facilities and making its investment decisions on the basis of net operating revenues considered as a whole. Moreover, the record shows that each transportation instrumentality serves to facilitate this cross-water movement in its own fashion, thereby benefiting not only its own users but also the users of other such instrumentalities. As previously mentioned, the existence of mass-transportation facilities serves to avoid congestion on all bridges. The bridges in turn benefit the users of these other facilities by contributing towards their financial support. It is therefore appropriate for the Administrator to include the capital invested in each in forming the investment base to measure the rate of return." (footnote omitted).

**18.** The relevant legislative findings were simply:

(1) that the transportation of persons to, from and within the port of New York, and the flow of foreign and domestic cargoes to, from and through the port of New York are vital and essential to the preservation of the economic well-being of the northern New Jersey-New York metropolitan area;

(2) that in order to preserve the northern New Jersey-New York metropolitan area from economic deterioration, adequate facilities for the transportation of persons must be provided, preserved and maintained and that rail services are and will remain of extreme importance to such transportation of persons;

(3) that the interurban electric railway now or heretofore operated by the Hudson & Manhattan railroad company is an essential railroad facility serving the northern New Jersey-New York metropolitan area, that its physical plant is in a severely deteriorated condition, and that it is in extreme financial condition;

(4) that the immediate need for the maintenance and development of adequate railroad facilities for the transportation of persons between northern New Jersey and New York would be met by the acquisition, rehabilitation and operation of the said Hudson & Manhattan interurban electric railway by a public agency, and improvement and extensions of the rail transit lines of said railway to permit transfer of its passengers to and from other transportation facilities and in the provision of transfer facilities at the points of such transfers;

The legislation also contained the statutory covenant, Unconsolidated Laws § 6606, dealt with in the *United States Trust Company* case, *supra*, 431 U.S. 1, 97 S.Ct. 1505, 52 L.Ed.2d 92. While this allowed bridge tolls to be applied for "permitted" railroad purposes as therein defined, nothing in it suggests that these would be increased solely to provide added income for PATH.

**19.** Although no complete breakdown is given as between the vehicular facilities, we are told that of the 64,600 bus passengers, 54,000 used the W. 40th Street Terminal and only 5,000 the George Washington Bridge Bus Station.

The witness estimated that if PATH were abandoned, 85% of its passengers would transfer to autos or buses,[20] which would mean a peak hour load of 4,500 additional vehicles. This, he thought, would require a new four-lane tunnel and a lower Manhattan bus terminal, costing a minimum of $925 million in 1976 dollars. Debt service and operating expenses would amount to $107 million as against revenues of only $5 million.[21] The witness concluded that, even apart from savings provided by PATH in the use of energy and environmental benefits, bridge users are thus better off paying the deficits and a fair return on the investment in PATH.

Granted the force of this, the inclusion of PATH is still a giant leap from anything previously taken into account in determining appropriate rates under the "reasonable and just" provision of the General Bridge Act of 1906. The PA witness stated that, because of its location, the George Washington Bridge traffic is "predominately peripheral" (Ex. PA 7, p. 25); shutting down PATH thus would affect it in the first instance less than the tunnels; it is the overcrowding of the latter that might congest the Bridge. The question was not whether PATH requires subsidization but whether, in the absence of Congressional action such as the 1952 legislation concerning DRPA, the huge deficits of PATH can properly be loaded onto users of the PA bridges—three of which have almost no functional relationship and the fourth, the George Washington Bridge, only a small one. There was no showing that it was the level of the previous tolls rather than the convenience of the bridges and tunnels that was drawing traffic away from PATH or that the higher ones would increase PATH ridership. The higher bridge tolls are paid not simply by commuters who opt to use the George Washington Bridge when they could as readily have used PATH but by commuters for whom PATH was not a feasible alternative, by non-commuter passengers including many who were not destined to or did not originate in Manhattan or nearby New Jersey, and even by trucks. Another fair question, unanswered by the Administrator, is why, as a matter of policy, if users of all the PA bridges are to be tapped to sustain the other facilities here in question, particularly PATH, the proceeds should not be used to support all New York-New Jersey commuter services, including those using the ConRail Tunnel; this, of course, would require legislation. Also the Administrator seems to have taken as a given that there should be no increase in PATH's 30 cent fare. We see no basis for this. Despite the failure of one such attempt a few years ago because of political opposition,[22] the inflation since then, the mounting PATH deficits, and the history of fares on similar facilities including the New York subways, make such a fare *prima facie* unreasonably low.

In substance, what the Administrator did here was to implement the preferred legislative recommendation of the Secretary of Transportation, Bridge Toll Study, *supra*, note 12, Option (3), pp. 67, 70–71, whereby bridge tolls in major urban areas may be used not only to recover bridge construction, operating and maintenance costs, but to "provide complementary capital improvements to highways or transit systems

---

**20.** The remaining 15% would use ConRail's service to Pennsylvania Station.

**21.** Apparently these low revenue estimates took account only of the PATH traffic. In fact a new tunnel would lead to a redistribution of all tunnel traffic, with consequent better utilization of the new tunnel in off-peak hours, and might generate new traffic.

**22.** A proposal in 1973–1974 to raise the fare to 50 cents was withdrawn because of the opposition of Governor Byrne of New Jersey. See

New York Times (N.J. ed.), Feb. 15, 1974, p. 1:1, where PA Commissioner Hofman explained the withdrawal:

"Fundamentally, Governor Byrne doesn't want the fare increases, and he's the boss. It took us about a tenth of a second to decide." One of the Governor's reasons was that PATH should be assisted by an increase in the motor vehicle tolls. See New York Times (N.J. ed.), Feb. 12, 1974, p. 1:1.

and/or transit operating assistance within the urban area." Apart from any question whether Congress would have enacted such legislation if the Secretary had submitted it, as he undertook to do in his report of July 1, 1974, such legislation would very likely have contained safeguards absent from the Administrator's approval here.[23] Indeed, such would very likely have been provided if the rulemaking directed by § 133(b) of the Federal-Aid Highway Act of 1973, *supra*, 87 Stat. 267, had ever occurred.

Still we cannot quite bring ourselves to say that the action of the Administrator in approving the increased tolls was arbitrary or capricious on the record that was before him. Perhaps this is a case where it does matter that this rather than substantial evidence is the applicable standard, see *Abbott Laboratories v. Gardner*, 387 U.S. 136, 143, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967); *Associated Industries of New York State, Inc. v. United States Department of Labor*, 487 F.2d 342, 347–50 (2 Cir. 1973). Many of the serious questions we have posed seem not to have been fully developed before the agency if they were propounded at all. The Auto Clubs chose to proceed on an all or nothing basis, resisting inclusion of anything but the four bridges. If the Administrator's choice was simply between the narrow concept urged by the Auto Clubs and the broader one that he adopted, his action was not so wrong as to demand our remanding the case to him, particularly since, especially in the light of increased costs since his decision, we would leave the existing tolls in effect pending such a remand. We therefore affirm, but with the caveat that this shall not be deemed to constitute an approval or rejection of the Administrator's action or to preclude a new protest, taking account of points raised in this opinion and others, unless new legislation or the regulations required by § 133(b) of the Federal-Aid Highway Act of 1973, which would remove or alter the points in controversy, is forthcoming within a reasonable time.

23. Under N.Y.Pub.Auth.L. §§ 569–c and 1219–a, the Triborough Bridge and Tunnel Authority can transfer its surplus funds to the New York

The order of the district court is affirmed. No costs.

City Transit Authority for capital expenses and, if the City provides sufficient capital funds, for operating expenses.